# RENO, ATTORNEY GENERAL, ET AL. *v.* FLORES ET AL.

No. 91–905.   Argued October 13, 1992—Decided March 23, 1993

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, KENNEDY, SOUTER, and THOMAS, JJ.,

joined. O'CONNOR, J., filed a concurring opinion, in which SOUTER, J., joined, *post*, p. 315. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 320.

*Deputy Solicitor General Mahoney* argued the cause for petitioners. With her on the briefs were *Solicitor General Starr, Assistant Attorney General Gerson, Ronald J. Mann, Michael Jay Singer,* and *John C. Hoyle.*

*Carlos Holguin* argued the cause for respondents. With him on the brief were *Peter A. Schey, Paul Hoffman, Mark Rosenbaum, James Morales, Alice Bussiere, Lucas Guttentag,* and *John A. Powell.**

JUSTICE SCALIA delivered the opinion of the Court.

Over the past decade, the Immigration and Naturalization Service (INS or Service) has arrested increasing numbers of alien juveniles who are not accompanied by their parents or other related adults. Respondents, a class of alien juveniles so arrested and held in INS custody pending their deportation hearings, contend that the Constitution and immigration laws require them to be released into the custody of "responsible adults."

## I

Congress has given the Attorney General broad discretion to determine whether, and on what terms, an alien arrested on suspicion of being deportable should be released pending

---

*Briefs of *amici curiae* urging affirmance were filed for the American Bar Association by *Talbot D'Alemberte, Andrew S. Krulwich,* and *Christopher D. Cerf;* for Amnesty International U. S. A. by *Clara A. Pope;* for the Child Welfare League of America et al. by *J. Michael Klise, Clifton S. Elgarten,* and *John R. Heisse II;* for the Southwest Refugee Rights Project et al. by *Antonia Hernandez, Richard Larson, Susan M. Lydon,* and *Bill Ong Hing;* and for the United States Catholic Conference et al. by *William F. Abrams.*

the deportation hearing.[1] The Board of Immigration Appeals has stated that "[a]n alien generally . . . should not be detained or required to post bond except on a finding that he is a threat to the national security . . . or that he is a poor bail risk." *Matter of Patel*, 15 I. & N. Dec. 666 (1976); cf. *INS* v. *National Center for Immigrants' Rights, Inc. (NCIR)*, 502 U. S. 183 (1991) (upholding INS regulation imposing conditions upon release). In the case of arrested alien *juveniles*, however, the INS cannot simply send them off into the night on bond or recognizance. The parties to the present suit agree that the Service must assure itself that someone will care for those minors pending resolution of their deportation proceedings. That is easily done when the juvenile's parents have also been detained and the family can be released together; it becomes complicated when the juvenile is arrested alone, *i. e.*, unaccompanied by a parent, guardian, or other related adult. This problem is a serious one, since the INS arrests thousands of alien juveniles each year (more than 8,500 in 1990 alone)—as many as 70% of them unaccompanied. Brief for Petitioners 8. Most of these minors are boys in their midteens, but perhaps 15% are girls and the same percentage 14 years of age or younger. See *id.*, at 9, n. 12; App. to Pet. for Cert. 177a.

For a number of years the problem was apparently dealt with on a regional and ad hoc basis, with some INS offices releasing unaccompanied alien juveniles not only to their parents but also to a range of other adults and organizations.

---

[1] Title 8 U. S. C. §1252(a)(1), 66 Stat. 208, as amended, provides: "[A]ny such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (A) be continued in custody; or (B) be released under bond . . . containing such conditions as the Attorney General may prescribe; or (C) be released on conditional parole. But such bond or parole . . . may be revoked at any time by the Attorney General, in his discretion . . . ."

The Attorney General's discretion to release aliens convicted of aggravated felonies is narrower. See 8 U. S. C. § 1252(a)(2) (1988 ed., Supp. III).

In 1984, responding to the increased flow of unaccompanied juvenile aliens into California, the INS Western Regional Office adopted a policy of limiting the release of detained minors to " 'a parent or lawful guardian,' " except in " 'unusual and extraordinary cases,' " when the juvenile could be released to " 'a responsible individual who agrees to provide care and be responsible for the welfare and well being of the child.' " See *Flores* v. *Meese*, 934 F. 2d 991, 994 (CA9 1990) (quoting policy), vacated, 942 F. 2d 1352 (CA9 1991) (en banc).

In July of the following year, the four respondents filed an action in the District Court for the Central District of California on behalf of a class, later certified by the court, consisting of all aliens under the age of 18 who are detained by the INS Western Region because "a parent or legal guardian fails to personally appear to take custody of them." App. 29. The complaint raised seven claims, the first two challenging the Western Region release policy (on constitutional, statutory, and international law grounds), and the final five challenging the conditions of the juveniles' detention.

The District Court granted the INS partial summary judgment on the statutory and international law challenges to the release policy, and in late 1987 approved a consent decree that settled all claims regarding the detention conditions. The court then turned to the constitutional challenges to the release policy, and granted respondents partial summary judgment on their equal protection claim that the INS had no rational basis for treating alien minors in deportation proceedings differently from alien minors in exclusion proceedings[2] (whom INS regulations permitted to be paroled, in some circumstances, to persons other than parents and legal guardians, including other relatives and "friends," see 8 CFR §212.5(a)(2)(ii) (1987)). This prompted the INS to initiate

---

[2] Exclusion proceedings, which are not at issue in the present case, involve aliens apprehended before "entering" the United States, as that term is used in the immigration laws. See *Leng May Ma* v. *Barber*, 357 U. S. 185, 187 (1958).

notice-and-comment rulemaking "to codify Service policy regarding detention and release of juvenile aliens and to provide a single policy for juveniles in both deportation and exclusion proceedings." 52 Fed. Reg. 38245 (1987). The District Court agreed to defer consideration of respondents' due process claims until the regulation was promulgated.

The uniform deportation-exclusion rule finally adopted, published on May 17, 1988, see Detention and Release of Juveniles, 53 Fed. Reg. 17449 (codified as to deportation at 8 CFR § 242.24 (1992)), expanded the possibilities for release somewhat beyond the Western Region policy, but not as far as many commenters had suggested. It provides that alien juveniles "shall be released, in order of preference, to: (i) a parent; (ii) a legal guardian; or (iii) an adult relative (brother, sister, aunt, uncle, grandparent) who are [sic] not presently in INS detention," unless the INS determines that "the detention of such juvenile is required to secure his timely appearance before the Service or the immigration court or to ensure the juvenile's safety or that of others." 8 CFR § 242.24(b)(1) (1992). If the only listed individuals are in INS detention, the Service will consider simultaneous release of the juvenile and custodian "on a discretionary case-by-case basis." § 242.24(b)(2). A parent or legal guardian who is in INS custody or outside the United States may also, by sworn affidavit, designate another person as capable and willing to care for the child, provided that person "execute[s] an agreement to care for the juvenile and to ensure the juvenile's presence at all future proceedings." § 242.24(b)(3). Finally, in "unusual and compelling circumstances and in the discretion of the [INS] district director or chief patrol agent," juveniles may be released to other adults who execute a care and attendance agreement. § 242.24(b)(4).

If the juvenile is *not* released under the foregoing provision, the regulation requires a designated INS official, the "Juvenile Coordinator," to locate "suitable placement . . . in a facility designated for the occupancy of juveniles."

§ 242.24(c). The Service may briefly hold the minor in an "INS detention facility having separate accommodations for juveniles," § 242.24(d), but under the terms of the consent decree resolving respondents' conditions-of-detention claims, the INS must within 72 hours of arrest place alien juveniles in a facility that meets or exceeds the standards established by the Alien Minors Care Program of the Community Relations Service (CRS), Department of Justice, 52 Fed. Reg. 15569 (1987). See Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention, *Flores v. Meese*, No. 85–4544–RJK (Px) (CD Cal., Nov. 30, 1987) (incorporating the CRS notice and program description), reprinted in App. to Pet. for Cert. 148a–205a (hereinafter Juvenile Care Agreement).

Juveniles placed in these facilities are deemed to be in INS detention "because of issues of payment and authorization of medical care." 53 Fed. Reg., at 17449. "Legal custody" rather than "detention" more accurately describes the reality of the arrangement, however, since these are not correctional institutions but facilities that meet "state licensing requirements for the provision of shelter care, foster care, group care, and related services to dependent children," Juvenile Care Agreement 176a, and are operated "in an open type of setting without a need for extraordinary security measures," *id.*, at 173a. The facilities must provide, in accordance with "applicable state child welfare statutes and generally accepted child welfare standards, practices, principles and procedures," *id.*, at 157a, an extensive list of services, including physical care and maintenance, individual and group counseling, education, recreation and leisure-time activities, family reunification services, and access to religious services, visitors, and legal assistance, *id.*, at 159a, 178a–185a.

Although the regulation replaced the Western Region release policy that had been the focus of respondents' constitutional claims, respondents decided to maintain the litigation as a challenge to the new rule. Just a week after the regula-

tion took effect, in a brief, unpublished order that referred only to unspecified "due process grounds," the District Court granted summary judgment to respondents and invalidated the regulatory scheme in three important respects. *Flores* v. *Meese*, No. CV 85–4544–RJK (Px) (CD Cal., May 25, 1988), App. to Pet. for Cert. 146a. First, the court ordered the INS to release "any minor otherwise eligible for release . . . to his parents, guardian, custodian, conservator, *or other responsible adult party*." *Ibid.* (emphasis added). Second, the order dispensed with the regulation's requirement that unrelated custodians formally agree to *care for* the juvenile, 8 CFR §§ 242.24(b)(3) and (4) (1992), in addition to ensuring his attendance at future proceedings. Finally, the District Court rewrote the related INS regulations that provide for an initial determination of prima facie deportability and release conditions before an INS examiner, see § 287.3, with review by an immigration judge upon the alien's request, see § 242.2(d). It decreed instead that an immigration-judge hearing on probable cause and release restrictions should be provided "forthwith" after arrest, whether or not the juvenile requests it. App. to Pet. for Cert. 146a.

A divided panel of the Court of Appeals reversed. *Flores* v. *Meese*, 934 F. 2d 991 (CA9 1990). The Ninth Circuit voted to rehear the case and selected an 11-judge en banc court. See Ninth Circuit Rule 35–3. That court vacated the panel opinion and affirmed the District Court order "in all respects." *Flores* v. *Meese*, 942 F. 2d 1352, 1365 (1991). One judge dissented in part, see *id.*, at 1372–1377 (opinion of Rymer, J.), and four *in toto*, see *id.*, at 1377–1385 (opinion of Wallace, C. J.). We granted certiorari. 503 U. S. 905 (1992).

## II

Respondents make three principal attacks upon INS regulation 242.24. First, they assert that alien juveniles suspected of being deportable have a "fundamental" right to "freedom from physical restraint," Brief for Respondents 16,

and it is therefore a denial of "substantive due process" to detain them, since the Service cannot prove that it is pursuing an important governmental interest in a manner narrowly tailored to minimize the restraint on liberty. Second, respondents argue that the regulation violates "procedural due process," because it does not require the Service to determine, with regard to *each individual* detained juvenile who lacks an approved custodian, whether his best interests lie in remaining in INS custody or in release to some other "responsible adult." Finally, respondents contend that even if the INS regulation infringes no constitutional rights, it exceeds the Attorney General's authority under 8 U. S. C. § 1252(a)(1). We find it economic to discuss the objections in that order, though we of course reach the constitutional issues only because we conclude that the respondents' statutory argument fails.[3]

Before proceeding further, however, we make two important observations. First, this is a facial challenge to INS regulation 242.24. Respondents do not challenge its application in a particular instance; it had not yet been applied in a particular instance—because it was not yet in existence—when their suit was brought (directed at the 1984 Western Region release policy), and it had been in effect only a week when the District Court issued the judgment invalidating it. We have before us no findings of fact, indeed no record, concerning the INS's interpretation of the regulation or the

---

[3] The District Court and all three judges on the Court of Appeals panel held in favor of the INS on this statutory claim, see *Flores* v. *Meese*, 934 F. 2d 991, 995, 997–1002 (CA9 1991); *id.*, at 1015 (Fletcher, J., dissenting); the en banc court (curiously) did not address the claim, proceeding immediately to find the rule unconstitutional. Although respondents did not cross-petition for certiorari on the statutory issue, they may legitimately defend their judgment on any ground properly raised below. See *Washington* v. *Confederated Bands and Tribes of Yakima Nation*, 439 U. S. 463, 476, n. 20 (1979). The INS does not object to our considering the issue, and we do so in order to avoid deciding constitutional questions unnecessarily. See *Jean* v. *Nelson*, 472 U. S. 846, 854 (1985).

history of its enforcement. We have only the regulation itself and the statement of basis and purpose that accompanied its promulgation. To prevail in such a facial challenge, respondents "must establish that no set of circumstances exists under which the [regulation] would be valid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987). That is true as to both the constitutional challenges, see *Schall* v. *Martin*, 467 U. S. 253, 268, n. 18 (1984), and the statutory challenge, see *NCIR*, 502 U. S., at 188.

The second point is related. Respondents spend much time, and their *amici* even more, condemning the conditions under which some alien juveniles are held, alleging that the conditions are so severe as to belie the Service's stated reasons for retaining custody—leading, presumably, to the conclusion that the retention of custody is an unconstitutional infliction of punishment without trial. See *Salerno, supra,* at 746–748; *Wong Wing* v. *United States*, 163 U. S. 228, 237 (1896). But whatever those conditions might have been when this litigation began, they are now (at least in the Western Region, where all members of the respondents' class are held) presumably in compliance with the extensive requirements set forth in the Juvenile Care Agreement that settled respondents' claims regarding detention conditions, see *supra*, at 298. The settlement agreement entitles respondents to enforce compliance with those requirements in the District Court, see Juvenile Care Agreement 148a–149a, which they acknowledge they have not done, Tr. of Oral Arg. 43. We will disregard the effort to reopen those settled claims by alleging, for purposes of the challenges to the regulation, that the detention conditions are other than what the consent decree says they must be.

## III

Respondents' "substantive due process" claim relies upon our line of cases which interprets the Fifth and Fourteenth Amendments' guarantee of "due process of law" to include

a substantive component, which forbids the government to infringe certain "fundamental" liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest. See, *e. g., Collins* v. *Harker Heights,* 503 U. S. 115, 125 (1992); *Salerno, supra,* at 746; *Bowers* v. *Hardwick,* 478 U. S. 186, 191 (1986). "Substantive due process" analysis must begin with a careful description of the asserted right, for "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Collins, supra,* at 125; see *Bowers* v. *Hardwick, supra,* at 194–195. The "freedom from physical restraint" invoked by respondents is not at issue in this case. Surely not in the sense of shackles, chains, or barred cells, given the Juvenile Care Agreement. Nor even in the sense of a right to come and go at will, since, as we have said elsewhere, "juveniles, unlike adults, are always in some form of custody," *Schall,* 467 U. S., at 265, and where the custody of the parent or legal guardian fails, the government may (indeed, we have said *must*) either exercise custody itself or appoint someone else to do so. *Ibid.* Nor is the right asserted the right of a child to be released from all other custody into the custody of its parents, legal guardian, or even close relatives: The challenged regulation requires such release when it is sought. Rather, the right at issue is the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution.

If there exists a fundamental right to be released into what respondents inaccurately call a "non-custodial setting," Brief for Respondents 18, we see no reason why it would apply only in the context of government custody incidentally acquired in the course of law enforcement. It would presumably apply to state custody over orphans and abandoned

children as well, giving federal law and federal courts a major new role in the management of state orphanages and other child-care institutions. Cf. *Ankenbrandt* v. *Richards,* 504 U. S. 689, 703–704 (1992). We are unaware, however, that any court—aside from the courts below—has ever held that a child has a constitutional right not to be placed in a decent and humane custodial institution if there is available a responsible person unwilling to become the child's legal guardian but willing to undertake temporary legal custody. The mere novelty of such a claim is reason enough to doubt that "substantive due process" sustains it; the alleged right certainly cannot be considered " 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Salerno, supra,* at 751 (quoting *Snyder* v. *Massachusetts,* 291 U. S. 97, 105 (1934)). Where a juvenile has no available parent, close relative, or legal guardian, where the government does not intend to punish the child, and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution. It is rationally connected to a governmental interest in "preserving and promoting the welfare of the child," *Santosky* v. *Kramer,* 455 U. S. 745, 766 (1982), and is not punitive since it is not excessive in relation to that valid purpose. See *Schall, supra,* at 269.

Although respondents generally argue for the categorical right of private placement discussed above, at some points they assert a somewhat more limited constitutional right: the right to an individualized hearing on whether private placement would be in the child's "best interests"—followed by private placement if the answer is in the affirmative. It seems to us, however, that if institutional custody (despite the availability of responsible private custodians) is not unconstitutional in itself, it does not become so simply because it is shown to be less desirable than some other arrangement for the particular child. "The best interests of the child," a venerable phrase familiar from divorce proceedings, is a

proper and feasible criterion for making the decision as to which of two parents will be accorded custody. But it is not traditionally the sole criterion—much less the sole *constitutional* criterion—for other, less narrowly channeled judgments involving children, where their interests conflict in varying degrees with the interests of others. Even if it were shown, for example, that a particular couple desirous of adopting a child would *best* provide for the child's welfare, the child would nonetheless not be removed from the custody of its parents so long as they were providing for the child *adequately.* See *Quilloin* v. *Walcott,* 434 U. S. 246, 255 (1978). Similarly, "the best interests of the child" is not the legal standard that governs parents' or guardians' exercise of their custody: So long as certain minimum requirements of child care are met, the interests of the child may be subordinated to the interests of other children, or indeed even to the interests of the parents or guardians themselves. See, *e. g., R. C. N.* v. *State,* 141 Ga. App. 490, 491, 233 S. E. 2d 866, 867 (1977).

"The best interests of the child" is likewise not an absolute and exclusive constitutional criterion for the government's exercise of the custodial responsibilities that it undertakes, which must be reconciled with many other responsibilities. Thus, child-care institutions operated by the State in the exercise of its *parens patriae* authority, see *Schall, supra,* at 265, are not constitutionally required to be funded at such a level as to provide the *best* schooling or the *best* health care available; nor does the Constitution require them to substitute, wherever possible, private nonadoptive custody for institutional care. And the same principle applies, we think, to the governmental responsibility at issue here, that of retaining or transferring custody over a child who has come within the Federal Government's control, when the parents or guardians of that child are nonexistent or unavailable. Minimum standards must be met, and the child's fundamental rights must not be impaired; but the decision to go be-

yond those requirements—to give one or another of the child's additional interests priority over other concerns that compete for public funds and administrative attention—is a policy judgment rather than a constitutional imperative.

Respondents' "best interests" argument is, in essence, a demand that the INS program be narrowly tailored to minimize the denial of release into private custody. But narrow tailoring is required only when fundamental rights are involved. The impairment of a lesser interest (here, the alleged interest in being released into the custody of strangers) demands no more than a "reasonable fit" between governmental purpose (here, protecting the welfare of the juveniles who have come into the Government's custody) and the means chosen to advance that purpose. This leaves ample room for an agency to decide, as the INS has, that administrative factors such as lack of child-placement expertise favor using one means rather than another. There is, in short, no constitutional need for a hearing to determine whether private placement would be better, so long as institutional custody is (as we readily find it to be, assuming compliance with the requirements of the consent decree) good enough.

If we harbored any doubts as to the constitutionality of institutional custody over unaccompanied juveniles, they would surely be eliminated as to those juveniles (concededly the overwhelming majority of all involved here) who are aliens. "For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews* v. *Diaz*, 426 U. S. 67, 81 (1976). "'[O]ver no conceivable subject is the legislative power of Congress more complete.'" *Fiallo* v. *Bell*, 430 U. S. 787, 792 (1977) (quoting *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320, 339 (1909)). Thus, "in the exercise of its broad power over immigration and naturalization, 'Congress regularly makes

rules that would be unacceptable if applied to citizens.'" 430 U. S., at 792 (quoting *Mathews* v. *Diaz, supra,* at 79–80). Respondents do not dispute that Congress has the authority to detain aliens suspected of entering the country illegally pending their deportation hearings, see *Carlson* v. *Landon,* 342 U. S. 524, 538 (1952); *Wong Wing* v. *United States,* 163 U. S., at 235. And in enacting the precursor to 8 U. S. C. § 1252(a), Congress eliminated any presumption of release pending deportation, committing that determination to the discretion of the Attorney General. See *Carlson* v. *Landon, supra,* at 538–540. Of course, the INS regulation must still meet the (unexacting) standard of rationally advancing some legitimate governmental purpose—which it does, as we shall discuss later in connection with the statutory challenge.

Respondents also argue, in a footnote, that the INS release policy violates the "equal protection guarantee" of the Fifth Amendment because of the disparate treatment evident in (1) releasing alien juveniles with close relatives or legal guardians but detaining those without, and (2) releasing to unrelated adults juveniles detained pending federal delinquency proceedings, see 18 U. S. C. § 5034, but detaining unaccompanied alien juveniles pending deportation proceedings. The tradition of reposing custody in close relatives and legal guardians is in our view sufficient to support the former distinction; and the difference between citizens and aliens is adequate to support the latter.

## IV

We turn now from the claim that the INS cannot deprive respondents of their asserted liberty interest *at all,* to the "procedural due process" claim that the Service cannot do so on the basis of the procedures it provides. It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings. See *The Japanese Immigrant Case,* 189 U. S. 86, 100–101 (1903). To determine whether these alien juveniles have received it here, we must

first review in some detail the procedures the INS has employed.

Though a procedure for obtaining warrants to arrest named individuals is available, see 8 U. S. C. § 1252(a)(1); 8 CFR § 242.2(c)(1) (1992), the deportation process ordinarily begins with a warrantless arrest by an INS officer who has reason to believe that the arrestee "is in the United States in violation of any [immigration] law or regulation and is likely to escape before a warrant can be obtained," 8 U. S. C. § 1357(a)(2). Arrested aliens are almost always offered the choice of departing the country voluntarily, 8 U. S. C. § 1252(b) (1988 ed., Supp. III); 8 CFR § 242.5 (1992), and as many as 98% of them take that course. See *INS* v. *Lopez-Mendoza*, 468 U. S. 1032, 1044 (1984). Before the Service seeks execution of a voluntary departure form by a *juvenile*, however, the juvenile "must in fact communicate with either a parent, adult relative, friend, or with an organization found on the free legal services list." 8 CFR § 242.24(g) (1992).[4] If the juvenile does not seek voluntary departure, he must be brought before an INS examining officer within 24 hours of his arrest. § 287.3; see 8 U. S. C. § 1357(a)(2). The examining officer is a member of the Service's enforcement staff, but must be someone other than the arresting officer (unless no other qualified examiner is readily available). 8 CFR § 287.3 (1992). If the examiner determines that "there is prima facie evidence establishing that the arrested alien is in the United States in violation of the immigration laws," *ibid.*, a formal deportation proceeding is initiated through the issuance of an order to show cause, § 242.1, and within 24 hours the decision is made whether to continue the alien juvenile in custody or release him, § 287.3.

---

[4] Alien juveniles from Canada and Mexico must be offered the opportunity to make a telephone call but need not in fact do so, see 8 CFR § 242.24(g) (1992); the United States has treaty obligations to notify diplomatic or consular officers of those countries whenever their nationals are detained, see § 242.2(g).

The INS notifies the alien of the commencement of a deportation proceeding and of the decision as to custody by serving him with a Form I-221S (reprinted in App. to Brief for Petitioners 7a–8a) which, pursuant to the Immigration Act of 1990, 8 U. S. C. § 1252b(a)(3)(A) (1988 ed., Supp. III), must be in English and Spanish. The front of this form notifies the alien of the allegations against him and the date of his deportation hearing. The back contains a section entitled "NOTICE OF CUSTODY DETERMINATION," in which the INS officer checks a box indicating whether the alien will be detained in the custody of the Service, released on recognizance, or released under bond. Beneath these boxes, the form states: "You may request the Immigration Judge to redetermine this decision." See 8 CFR § 242.2(c)(2) (1992). (The immigration judge is a quasi-judicial officer in the Executive Office for Immigration Review, a division separated from the Service's enforcement staff. § 3.10.) The alien must check either a box stating "I do" or a box stating "[I] do not request a redetermination by an Immigration Judge of the custody decision," and must then sign and date this section of the form. If the alien requests a hearing and is dissatisfied with the outcome, he may obtain further review by the Board of Immigration Appeals, § 242.2(d); § 3.1(b)(7), and by the federal courts, see, e. g., Carlson v. Landon, supra, at 529, 531.

Respondents contend that this procedural system is unconstitutional because it does not require the Service to determine in the case of each individual alien juvenile that detention in INS custody would better serve his interests than release to some other "responsible adult." This is just the "substantive due process" argument recast in "procedural due process" terms, and we reject it for the same reasons.

The District Court and the en banc Court of Appeals concluded that the INS procedures are faulty because they do not provide for *automatic* review by an immigration judge of the initial deportability and custody determinations. See

942 F. 2d, at 1364. We disagree. At least insofar as this facial challenge is concerned, due process is satisfied by giving the detained alien juveniles the *right* to a hearing before an immigration judge. It has not been shown that all of them are too young or too ignorant to exercise that right when the form asking them to assert or waive it is presented. Most are 16 or 17 years old and will have been in telephone contact with a responsible adult outside the INS—sometimes a legal services attorney. The waiver, moreover, is revocable: The alien may request a judicial redetermination at any time later in the deportation process. See 8 CFR § 242.2(d) (1992); *Matter of Uluocha,* Interim Dec. 3124 (BIA 1989). We have held that juveniles are capable of "knowingly and intelligently" waiving their right against self-incrimination in criminal cases. See *Fare* v. *Michael C.,* 442 U. S. 707, 724–727 (1979); see also *United States* v. *Saucedo-Velasquez,* 843 F. 2d 832, 835 (CA5 1988) (applying *Fare* to alien juvenile). The alleged right to redetermination of prehearing custody status in deportation cases is surely no more significant.

Respondents point out that the regulations do not set a time period within which the immigration-judge hearing, if requested, must be held. But we will not assume, on this facial challenge, that an excessive delay will invariably ensue—particularly since there is no evidence of such delay, even in isolated instances. Cf. *Matter of Chirinos,* 16 I. & N. Dec. 276 (BIA 1977).

V

Respondents contend that the regulation goes beyond the scope of the Attorney General's discretion to continue custody over arrested aliens under 8 U. S. C. § 1252(a)(1). That contention must be rejected if the regulation has a " 'reasonable foundation,' " *Carlson* v. *Landon,* 342 U. S., at 541, that is, if it rationally pursues a purpose that it is lawful for the INS to seek. See also *NCIR,* 502 U. S., at 194. We think that it does.

The statement of basis and purpose accompanying promulgation of regulation 242.24, in addressing the question "as to whose custody the juvenile should be released," began with the dual propositions that "concern for the welfare of the juvenile will not permit release to just any adult" and that "the Service has neither the expertise nor the resources to conduct home studies for placement of each juvenile released." Detention and Release of Juveniles, 53 Fed. Reg. 17449 (1988). The INS decided to "strik[e] a balance" by defining a list of presumptively appropriate custodians while maintaining the discretion of local INS directors to release detained minors to other custodians in "unusual and compelling circumstances." *Ibid.* The list begins with parents, whom our society and this Court's jurisprudence have always presumed to be the preferred and primary custodians of their minor children. See *Parham v. J. R.*, 442 U. S. 584, 602–603 (1979). The list extends to other close blood relatives, whose protective relationship with children our society has also traditionally respected. See *Moore v. East Cleveland*, 431 U. S. 494 (1977); cf. *Village of Belle Terre v. Boraas*, 416 U. S. 1 (1974). And finally, the list includes persons given legal guardianship by the States, which we have said possess "special proficiency" in the field of domestic relations, including child custody. *Ankenbrandt v. Richards*, 504 U. S., at 704. When neither parent, close relative, or state-appointed guardian is immediately available,[5] the INS will normally keep legal custody of the juvenile, place him in a government-supervised and state-licensed shelter-care

---

[5] The regulation also provides for release to any person designated by a juvenile's parent or guardian as "capable and willing to care for the juvenile's well-being." 8 CFR § 242.24(b)(3) (1992). "[To] ensur[e] that the INS is actually receiving the wishes of the parent or guardian," 53 Fed. Reg. 17450 (1988), the designation must be in the form of a sworn affidavit executed before an immigration or consular officer.

facility, and continue searching for a relative or guardian, although release to others is possible in unusual cases.[6]

Respondents object that this scheme is motivated purely by "administrative convenience," a charge echoed by the dissent, see, e. g., post, at 320. This fails to grasp the distinction between administrative convenience (or, to speak less pejoratively, administrative efficiency) as the *purpose* of a policy—for example, a policy of not considering late-filed objections—and administrative efficiency as the reason for selecting one means of achieving a purpose over another. Only the latter is at issue here. The requisite statement of basis and purpose published by the INS upon promulgation of regulation 242.24 declares that the purpose of the rule is to protect "the welfare of the juvenile," 53 Fed. Reg. 17449 (1988), and there is no basis for calling that false. (Respondents' contention that the real purpose was to save money imputes not merely mendacity but irrationality, since respondents point out that detention in shelter-care facilities is more expensive than release.) Because the regulation involves no deprivation of a "fundamental" right, the Service was not compelled to ignore the costs and difficulty of alternative means of advancing its declared goal. Cf. *Stanley* v.

---

[6] The dissent maintains that, in making custody decisions, the INS cannot rely on "[c]ategorical distinctions between cousins and uncles, or between relatives and godparents or other responsible persons," because "[d]ue process demands more, far more." *Post*, at 343. Acceptance of such a proposition would revolutionize much of our family law. Categorical distinctions between relatives and nonrelatives, and between relatives of varying degree of affinity, have always played a predominant role in determining child custody and in innumerable other aspects of domestic relations. The dissent asserts, however, that it would prohibit such distinctions only for the purpose of "prefer[ring] *detention* [by which it means institutional detention] to *release*," and accuses us of "mischaracteriz[ing] the issue" in suggesting otherwise. *Post*, at 343, n. 29. It seems to us that the dissent mischaracterizes the issue. The INS uses the categorical distinction between relatives and nonrelatives not to deny release, but to determine which potential custodians will be accepted without the safeguard of state-decreed guardianship.

*Illinois,* 405 U. S. 645, 656–657 (1972). It is impossible to contradict the Service's assessment that it lacks the "expertise," and is not "qualified," to do individualized child-placement studies, 53 Fed. Reg. 17449 (1988), and the right alleged here provides no basis for this Court to impose upon what is essentially a law enforcement agency the obligation to expend its limited resources in developing such expertise and qualification.[7] That reordering of priorities is for Congress—which has shown, we may say, no inclination to shrink from the task. See, *e. g.,* 8 U. S. C. § 1154(c) (requiring INS to determine if applicants for immigration are involved in "sham" marriages). We do not hold, as the dissent contends, that "minimizing administrative costs" is adequate justification for the Service's detention of juveniles, *post,* at 320; but we do hold that a detention program justified by the need to protect the welfare of juveniles is not constitutionally required to give custody to strangers if that entails the expenditure of administrative effort and resources that the Service is unwilling to commit.[8]

_____

[7] By referring unrelated persons seeking custody to state guardianship procedures, the INS is essentially drawing upon resources and expertise that are already in place. Respondents' objection to this is puzzling, in light of their assertion that the States generally view unrelated adults as appropriate custodians. See *post,* at 325–326, n. 7 (STEVENS, J., dissenting) (collecting state statutes). If that is so, one wonders why the individuals and organizations respondents allege are eager to accept custody do not rush to state court, have themselves appointed legal guardians (temporary or permanent, the States have procedures for both), and then obtain the juveniles' release under the terms of the regulation. Respondents and their *amici* do maintain that becoming a guardian can be difficult, but the problems they identify—delays in processing, the need to ensure that existing parental rights are not infringed, the "bureaucratic gauntlet"— would be no less significant were the INS to duplicate existing state procedures.

[8] We certainly agree with the dissent that this case must be decided in accordance with "indications of congressional policy," *post,* at 334. The most pertinent indication, however, is not, as the dissent believes, the federal statute governing detention of juveniles pending delinquency

Respondents also contend that the INS regulation violates the statute because it relies upon a "blanket" presumption of the unsuitability of custodians other than parents, close relatives, and guardians. We have stated that, at least in certain contexts, the Attorney General's exercise of discretion under § 1252(a)(1) requires "some level of individualized determination." *NCIR*, 502 U. S., at 194; see also *Carlson* v. *Landon*, 342 U. S., at 538. But as *NCIR* itself demonstrates, this does not mean that the Service must forswear use of reasonable presumptions and generic rules. See 502 U. S., at 196, n. 11; cf. *Heckler* v. *Campbell*, 461 U. S. 458, 467 (1983). In the case of each detained alien juvenile, the INS makes those determinations that are specific to the individual and necessary to accurate application of the regulation: Is there reason to believe the alien deportable? Is the alien under 18 years of age? Does the alien have an avail-

---

proceedings, 18 U. S. C. § 5034, but the statute under which the Attorney General is here acting, 8 U. S. C. § 1252(a)(1). That grants the Attorney General *discretion* to determine when temporary detention pending deportation proceedings is appropriate, and makes his exercise of that discretion "presumptively correct and unassailable except for abuse." *Carlson* v. *Landon*, 342 U. S. 524, 540 (1952). We assuredly cannot say that the decision to rely on universally accepted presumptions as to the custodial competence of parents and close relatives, and to defer to the expertise of the States regarding the capabilities of other potential custodians, is an abuse of this broad discretion simply because it does not track policies applicable outside the immigration field. See *NCIR*, 502 U. S. 183, 193–194 (1991). Moreover, reliance upon the States to determine guardianship is quite in accord with what Congress has directed in other immigration contexts. See 8 U. S. C. § 1154(d) (INS may not approve immigration petition for an alien juvenile orphan being adopted unless "a valid home-study has been favorably recommended by an agency of the State of the child's proposed residence, or by an agency authorized by that State to conduct such a study"); § 1522(d)(2)(B)(ii) (for refugee children unaccompanied by parents or close relatives, INS shall "attempt to arrange . . . placement under the laws of the States"); see also 45 CFR § 400.113 (1992) (providing support payments under § 1522 until the refugee juvenile is placed with a parent or with another adult "to whom legal custody and/or guardianship is granted under State law").

able adult relative or legal guardian? Is the alien's case so exceptional as to require consideration of release to someone else? The particularization and individuation need go no further than this.[9]

Finally, respondents claim that the regulation is an abuse of discretion because it permits the INS, once having determined that an alien juvenile lacks an available relative or legal guardian, to hold the juvenile in detention indefinitely. That is not so. The period of custody is inherently limited by the pending deportation hearing, which must be concluded with "reasonable dispatch" to avoid habeas corpus. 8 U. S. C. § 1252(a)(1); cf. *United States* v. *Salerno*, 481 U. S., at 747 (noting time limits placed on pretrial detention by the Speedy Trial Act). It is expected that alien juveniles will remain in INS custody an average of only 30 days. See Juvenile Care Agreement 178a. There is no evidence that alien juveniles are being held for undue periods pursuant to regulation 242.24, or that habeas corpus is insufficient to remedy particular abuses.[10] And the reasonableness of the

---

[9] The dissent would mandate fully individualized custody determinations for two reasons. First, because it reads *Carlson* v. *Landon, supra,* as holding that the Attorney General may not employ "mere presumptions" in exercising his discretion. *Post,* at 337. But it was only the *dissenters* in *Carlson* who took such a restrictive view. See 342 U. S., at 558–559, 563–564, 568 (Frankfurter, J., dissenting). Second, because it believes that § 1252(a) must be interpreted to require individualized hearings in order to avoid "'constitutional doubts.'" *Post,* at 334 (quoting *United States* v. *Witkovich,* 353 U. S. 194, 199 (1957)); see *post,* at 339–340. The "constitutional doubts" argument has been the last refuge of many an interpretive lost cause. Statutes should be interpreted to avoid *serious* constitutional doubts, *Witkovich, supra,* at 202, not to eliminate all possible contentions that the statute *might* be unconstitutional. We entertain no serious doubt that the Constitution does not require any more individuation than the regulation provides, see *supra,* at 303–305, 309, and thus find no need to supplement the text of § 1252(a).

[10] The dissent's citation of a single deposition from 1986, *post,* at 323, and n. 6, is hardly proof that "excessive delay" will result in the "typical" case, *post,* at 324, under regulation 242.24, which was not promulgated until mid-1988.

Service's negative assessment of putative custodians who fail to obtain legal guardianship would seem, if anything, to increase as time goes by.

\* \* \*

We think the INS policy now in place is a reasonable response to the difficult problems presented when the Service arrests unaccompanied alien juveniles. It may well be that other policies would be even better, but "we are [not] a legislature charged with formulating public policy." *Schall* v. *Martin,* 467 U. S., at 281. On its face, INS regulation 242.24 accords with both the Constitution and the relevant statute.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE SOUTER joins, concurring.

I join the Court's opinion and write separately simply to clarify that in my view these children have a constitutionally protected interest in freedom from institutional confinement. That interest lies within the core of the Due Process Clause, and the Court today does not hold otherwise. Rather, we reverse the decision of the Court of Appeals because the INS program challenged here, on its face, complies with the requirements of due process.

"Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha* v. *Louisiana,* 504 U. S. 71, 80 (1992). "Freedom from bodily restraint" means more than freedom from handcuffs, straitjackets, or detention cells. A person's core liberty interest is also implicated when she is confined in a prison, a mental hospital, or some other form of custodial institution, even if the conditions of confinement are liberal. This is clear beyond cavil, at least

where adults are concerned. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ." *DeShaney* v. *Winnebago County Dept. of Social Services*, 489 U. S. 189, 200 (1989). The institutionalization of an adult by the government triggers heightened, substantive due process scrutiny. There must be a "sufficiently compelling" governmental interest to justify such action, usually a punitive interest in imprisoning the convicted criminal or a regulatory interest in forestalling danger to the community. *United States* v. *Salerno*, 481 U. S. 739, 748 (1987); see *Foucha, supra,* at 80–81.

Children, too, have a core liberty interest in remaining free from institutional confinement. In this respect, a child's constitutional "[f]reedom from bodily restraint" is no narrower than an adult's. Beginning with *In re Gault,* 387 U. S. 1 (1967), we consistently have rejected the assertion that "a child, unlike an adult, has a right 'not to liberty but to custody.'" *Id.,* at 17. *Gault* held that a child in delinquency proceedings must be provided various procedural due process protections (notice of charges, right to counsel, right of confrontation and cross-examination, privilege against self-incrimination) when those proceedings may result in the child's institutional confinement. As we explained:

"Ultimately, however, we confront the reality of . . . the Juvenile Court process . . . . A boy is charged with misconduct. The boy is committed to an institution where he may be restrained of liberty for years. It is of no constitutional consequence—and of limited practical meaning—that the institution to which he is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a 'receiving home'

or an 'industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes a building with whitewashed walls, regimented routine and institutional hours. Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, [and] state employees . . . ." *Id.*, at 27 (footnote and internal quotation marks omitted).

See also *In re Winship*, 397 U. S. 358 (1970) (proof-beyond-reasonable-doubt standard applies to delinquency proceedings); *Breed* v. *Jones*, 421 U. S. 519 (1975) (double jeopardy protection applies to delinquency proceedings); *Parham* v. *J. R.*, 442 U. S. 584 (1979) (proceedings to commit child to mental hospital must satisfy procedural due process).

Our decision in *Schall* v. *Martin*, 467 U. S. 253 (1984), makes clear that children have a protected liberty interest in "freedom from institutional restraints," *id.*, at 265, even absent the stigma of being labeled "delinquent," see *Breed, supra*, at 529, or "mentally ill," see *Parham, supra*, at 600–601. In *Schall*, we upheld a New York statute authorizing pretrial detention of dangerous juveniles, but only after analyzing the statute at length to ensure that it complied with substantive and procedural due process. We recognized that children "are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae.*" 467 U. S., at 265. But this *parens patriae* purpose was seen simply as a plausible *justification* for state action implicating the child's protected liberty interest, not as a limitation on the scope of due process protection. See *ibid.* Significantly, *Schall* was essentially a facial challenge, as is this case, and New York's policy was to detain some juveniles in "open facilit[ies] in the community . . . without locks, bars, or security officers where the child receives schooling and counseling and has access to recreational facilities." *Id.*, at 271. A

child's placement in this kind of governmental institution is hardly the same as handcuffing her, or confining her to a cell, yet it must still satisfy heightened constitutional scrutiny.

It may seem odd that institutional placement as such, even where conditions are decent and humane and where the child has no less authority to make personal choices than she would have in a family setting, nonetheless implicates the Due Process Clause. The answer, I think, is this. Institutionalization is a decisive and unusual event. "The consequences of an erroneous commitment decision are more tragic where children are involved. [C]hildhood is a particularly vulnerable time of life and children erroneously institutionalized during their formative years may bear the scars for the rest of their lives." *Parham, supra,* at 627–628 (footnotes omitted) (opinion of Brennan, J.). Just as it is true that "[i]n our society liberty [for adults] is the norm, and detention prior to trial or without trial is the carefully limited exception," *Salerno, supra,* at 755, so too, in our society, children normally grow up in families, not in governmental institutions. To be sure, government's failure to take custody of a child whose family is unable to care for her may also effect harm. But the purpose of heightened scrutiny is not to prevent government from placing children in an institutional setting, where necessary. Rather, judicial review ensures that government acts in this sensitive area with the requisite care.

In sum, this case does not concern the scope of the Due Process Clause. We are not deciding whether the constitutional concept of "liberty" extends to some hitherto unprotected aspect of personal well-being, see, *e. g., Collins* v. *Harker Heights,* 503 U. S. 115 (1992); *Michael H.* v. *Gerald D.,* 491 U. S. 110 (1989); *Bowers* v. *Hardwick,* 478 U. S. 186 (1986), but rather whether a governmental decision implicating a squarely protected liberty interest comports with substantive and procedural due process. See *ante,* at 301–306

(substantive due process scrutiny); *ante,* at 306–309 (procedural due process scrutiny). Specifically, the absence of available parents, close relatives, or legal guardians to care for respondents does not vitiate their constitutional interest in freedom from institutional confinement. It does not place that interest outside the core of the Due Process Clause. Rather, combined with the Juvenile Care Agreement, the fact that the normal forms of custody have faltered explains why the INS program facially challenged here survives heightened, substantive due process scrutiny. "Where a juvenile has no available parent, close relative, or legal guardian, where the government does not intend to punish the child, and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution. It is rationally connected to a governmental interest in 'preserving and promoting the welfare of the child,' *Santosky* v. *Kramer,* 455 U. S. 745, 766 (1982), and is not punitive since it is not excessive in relation to that valid purpose." *Ante,* at 303. Because this is a facial challenge, the Court rightly focuses on the Juvenile Care Agreement. It is proper to presume that the conditions of confinement are no longer "'most disturbing,'" *Flores* v. *Meese,* 942 F. 2d 1352, 1358 (CA9 1991) (en banc) (quoting *Flores* v. *Meese,* 934 F. 2d 991, 1014 (CA9 1990) (Fletcher, J., dissenting)), and that the purposes of confinement are no longer the troublesome ones of lack of resources and expertise published in the Federal Register, see 53 Fed. Reg. 17449 (1988), but rather the plainly legitimate purposes associated with the Government's concern for the welfare of the minors. With those presumptions in place, "the terms and conditions of confinement . . . are in fact compatible with [legitimate] purposes," *Schall, supra,* at 269, and the Court finds that the INS program conforms with the Due Process Clause. On this understanding, I join the opinion of the Court.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

The Court devotes considerable attention to debunking the notion that "the best interests of the child" is an "absolute and exclusive" criterion for the Government's exercise of the custodial responsibilities that it undertakes. *Ante,* at 304. The Court reasons that as long as the conditions of detention are "good enough," *ante,* at 305, the Immigration and Naturalization Service (INS or Agency) is perfectly justified in declining to expend administrative effort and resources to minimize such detention. *Ante,* at 305, 311–312.

As I will explain, I disagree with that proposition, for in my view, an agency's interest in minimizing administrative costs is a patently inadequate justification for the detention of harmless children, even when the conditions of detention are "good enough."[1] What is most curious about the Court's analysis, however, is that the INS *itself* vigorously denies that its policy is motivated even in part by a desire to avoid the administrative burden of placing these children in the care of "other responsible adults." Reply Brief for Petitioners 4. That is, while the Court goes out of its way to attack "the best interest of the child" as a criterion for judging the INS detention policy, it is precisely that interest that the INS invokes as the sole basis for its refusal to release these children to "other responsible adults":

"[T]he articulated basis for the detention is that it furthers the government's interest in ensuring the welfare of the juveniles in its custody. . . .

"[Respondents] argu[e] that INS's interest in furthering juvenile welfare does not in fact support the policy

---

[1] Though the concurring JUSTICES join the Court's opinion, they too seem to reject the notion that the fact that "other concerns . . . compete for public funds and administrative attention," *ante,* at 305, is a sufficient justification for the INS' policy of refusing to make individualized determinations as to whether these juveniles should be detained. *Ante,* at 319 (concurring opinion).

because INS has a 'blanket' policy that requires deten-
tion without any factual showing that detention is neces-
sary to ensure respondents' welfare. . . . That argument,
however, represents nothing more than a policy dis-
agreement, because it criticizes INS for failing to pursue
a view of juvenile welfare that INS has not adopted,
namely the view held by respondent: that it is better for
alien juveniles to be released to unrelated adults than to
be cared for in suitable, government-monitored juvenile-
care facilities, except in those cases where the govern-
ment has knowledge that the particular adult seeking
custody is unfit.  The policy adopted by INS, reflect-
ing the traditional view of our polity that parents
and guardians are the most reliable custodians for
juveniles, is that it is inappropriate to release alien
juveniles—whose troubled background and lack of famil-
iarity with our society and culture, give them partic-
ularized needs not commonly shared by domestic juve-
niles—to adults who are not their parents or guardians."
*Id.*, at 4–5 (internal citations, emphasis, and quotation
marks omitted).

Possibly because of the implausibility of the INS' claim
that it has made a reasonable judgment that detention in
government-controlled or government-sponsored facilities is
"better" or more "appropriate" for these children than re-
lease to independent *responsible* adults, the Court reaches
out to justify the INS policy on a ground not only not argued,
but expressly disavowed by the INS, that is, the tug of
"other concerns that compete for public funds and adminis-
trative attention," *ante*, at 305.  I cannot share my col-
leagues' eagerness for that aggressive tack in a case involv-
ing a substantial deprivation of liberty.  Instead, I will
begin where the INS asks us to begin, with its assertion that
its policy is justified by its interest in protecting the welfare
of these children.  As I will explain, the INS' decision to
detain these juveniles despite the existence of responsible

adults willing and able to assume custody of them is contrary to federal policy, is belied by years of experience with both citizen and alien juveniles, and finds no support whatsoever in the administrative proceedings that led to the promulgation of the Agency's regulation. I will then turn to the Court's statutory and constitutional analysis and explain why this ill-conceived and ill-considered regulation is neither authorized by § 242(a) of the Immigration and Nationality Act nor consistent with fundamental notions of due process of law.

At the outset, it is important to emphasize two critical points. First, this case involves the institutional detention of juveniles who pose no risk of flight and no threat of harm to themselves or to others. They are children who have responsible third parties available to receive and care for them; many, perhaps most, of them will never be deported.[2] It makes little difference that juveniles, unlike adults, are always in some form of custody, for detention in an institution pursuant to the regulation is vastly different from release to a responsible person—whether a cousin,[3] a godparent, a friend, or a charitable organization—willing to assume responsibility for the juvenile for the time the child would otherwise be detained.[4] In many ways the difference is

---

[2] See Tr. of Oral Arg. 55 (statement by counsel for petitioners).

[3] The Court assumes that the rule allows release to any "close relative," *ante,* at 302. The assumption is incorrect for two reasons: The close character of a family relationship is determined by much more than the degree of affinity; moreover, contrary to the traditional view expressed in *Moore* v. *East Cleveland,* 431 U. S. 494, 504 (1977), the INS rule excludes cousins.

[4] The difference is readily apparent even from the face of the allegedly benign Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention, reprinted in App. to Pet. for Cert. 148a–205a (Juvenile Care Agreement), upon which the Court so heavily relies to sustain this regulation. To say that a juvenile care facility under the agreement is to be operated " 'in an open type of setting without a need for *extraordinary* security measures,' " *ante,* at 298 (quoting Juvenile Care Agreement 173a) (emphasis added), suggests that the facility has some *standard* level of security designed to ensure that children do not

comparable to the difference between imprisonment and probation or parole. Both conditions can be described as "legal custody," but the constitutional dimensions of individual "liberty" identify the great divide that separates the two. See *Morrissey* v. *Brewer*, 408 U. S. 471, 482 (1972). The same is true regarding the allegedly improved conditions of confinement—a proposition, incidentally, that is disputed by several *amici curiae*.[5] The fact that the present conditions may satisfy standards appropriate for incarcerated juvenile offenders does not detract in the slightest from the basic proposition that this is a case about the wholesale detention of children who do not pose a risk of flight, and who are not a threat to either themselves or the community.

Second, the period of detention is indefinite, and has, on occasion, approached one year.[6] In its statement of policy

---

leave. That notion is reinforced by the very next sentence in the agreement: "However, [r]ecipients are required to design programs and strategies to discourage runaways and prevent the unauthorized absence of minors in care." *Ibid.*

Indeed, the very definition of the word "detention" in the American Bar Association's Juvenile Justice Standards reflects the fact that it still constitutes detention even if a juvenile is placed in a facility that is "decent and humane," *ante*, at 303:

"The definition of detention in this standard includes every facility used by the state to house juveniles during the interim period. Whether it gives the appearance of the worst sort of jail, or a comfortable and pleasant home, the facility is classified as 'detention' if it is not the juvenile's usual place of abode." Institute of Judicial Administration, American Bar Association, Juvenile Justice Standards: Standards Relating to Interim Status 45 (1980) (citing Wald, "Pretrial Detention for Juveniles," in Pursuing Justice for the Child 119, 120 (Rosenheim ed. 1976)).

The point cannot be overemphasized. The legal formalism that children are always in someone else's custody should not obscure the fact that "[i]nstitutionalization," as JUSTICE O'CONNOR explains, "is a decisive and unusual event." *Ante*, at 318 (concurring opinion).

[5] See Brief for Southwest Refugee Rights Project et al. as *Amici Curiae* 20–33.

[6] See Deposition of Kim Carter Hedrick, INS Detention Center Director-Manager (CD Cal., June 27, 1986), p. 68.

governing proposed contracts with private institutions that may assume physical (though not legal) custody of these minors, the INS stated that the duration of the confinement "is anticipated to be approximately thirty (30) days; however, due to the variables and uncertainties inherent in each case, [r]ecipients must design programs which are able to provide a combination of short term and long term care." Juvenile Care Agreement 178a. The INS rule itself imposes no time limit on the period of detention. The only limit is the statutory right to seek a writ of habeas corpus on the basis of a "conclusive showing" that the Attorney General is not processing the deportation proceeding "with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case . . . ." 8 U. S. C. § 1252(a)(1). Because examples of protracted deportation proceedings are so common, the potential for a lengthy period of confinement is always present. The fact that an excessive delay may not "invariably ensue," *ante*, at 309, provides small comfort to the typical detainee.

## I

The Court glosses over the history of this litigation, but that history speaks mountains about the bona fides of the Government's asserted justification for its regulation, and demonstrates the complete lack of support, in either evidence or experience, for the Government's contention that detaining alien juveniles when there are "other responsible parties" willing to assume care somehow protects the interests of these children.

The case was filed as a class action in response to a policy change adopted in 1984 by the Western Regional Office of the INS. Prior to that change, the relevant policy in the Western Region had conformed to the practice followed by the INS in the rest of the country, and also followed by federal magistrates throughout the country in the administration of § 504 of the Juvenile Justice and Delinquency Preven-

tion Act of 1974. Consistently with the consensus expressed in a number of recommended standards for the treatment of juveniles,[7] that statute authorizes the release of a juvenile

[7] See, *e. g.,* U. S. Dept. of Health, Education, and Welfare, Model Acts for Family Courts and State-Local Children's Programs 24 (1975) ("[W]ith all possible speed" the child should be released to "parents, guardian, custodian, or other suitable person able and willing to provide supervision and care"); U. S. Dept. of Justice, National Advisory Committee for Juvenile Justice and Delinquency Prevention, Standards for the Administration of Juvenile Justice 299 (1980) (a juvenile subject to the jurisdiction of the family court "should be placed in a foster home or shelter facility only when . . . there is no person willing and able to provide supervision and care"); National Advisory Commission on Criminal Justice Standards and Goals, Corrections 267 (1973) ("Detention should be used only where the juvenile has no parent, guardian, custodian, or other person able to provide supervision and care"); Institute of Judicial Administration, American Bar Association, Standards Relating to Noncriminal Misbehavior 41, 42 (1982) ("If the juvenile consents," he should be released "to the parent, custodian, relative, or other responsible person as soon as practicable").

State law from across the country regarding the disposition of juveniles who come into state custody is consistent with these standards. See, *e. g.,* Ala. Code § 12–15–62 (1986) (allowing release to custody of "a parent, guardian, custodian or any other person who the court deems proper"); Conn. Gen. Stat. § 46b–133 (1986) (allowing release to "parent or parents, guardian or some other suitable person or agency"); D. C. Code Ann. § 16–2310 (1989) (allowing release to "parent, guardian, custodian, or other person or agency able to provide supervision and care for him"); Idaho Code § 16–1811.1(c) (Supp. 1992) (allowing release to custody of "parent or other responsible adult"); Iowa Code § 232.19(2) (1987) (release to "parent, guardian, custodian, responsible adult relative, or other adult approved by the court"); Ky. Rev. Stat. Ann. § 610.200 (Michie 1990) (release to custody of "relative, guardian, person exercising custodial control or supervision or other responsible person"); Me. Rev. Stat. Ann., Tit. 15, § 3203–A (Supp. 1992) (release to "legal custodian or other suitable person"); Md. Cts. & Jud. Proc. Code Ann. § 3–814(b)(1) (1989) (release to "parents, guardian, or custodian or to any other person designated by the court"); Mass. Gen. Laws § 119:67 (1969) (release to "parent, guardian or any other reputable person"); Minn. Stat. § 260.171 (1992) (release to "parent, guardian, custodian, or other suitable person"); Miss. Code Ann. § 43–21–301(4) (Supp. 1992) (release to "any person or agency"); Neb. Rev. Stat. § 43–253 (1988) (release to "parent, guardian, relative, or other responsible person");

charged with an offense "to his parents, guardian, custodian, or *other responsible party (including, but not limited to, the director of a shelter-care facility)* upon their promise to bring such juvenile before the appropriate court when requested by such court unless the magistrate determines, after hearing, at which the juvenile is represented by counsel, that the detention of such juvenile is required to secure his timely appearance before the appropriate court or to insure his safety or that of others." 18 U. S. C. § 5034 (emphasis added).[8] There is no evidence in the record of this litigation that any release by the INS, or by a federal magistrate, to an "other responsible party" ever resulted in any harm to a juvenile. Thus, nationwide experience prior to 1984 discloses no evidence of any demonstrated need for a change in INS policy.

Nevertheless, in 1984 the Western Region of the INS adopted a separate policy for minors in deportation proceedings, but not for exclusion proceedings. The policy provided that minors would be released only to a parent or lawful guardian, except " 'in unusual and extraordinary cases, at the

---

Nev. Rev. Stat. § 62.170 (1991) (release to "parent or other responsible adult"); N. H. Rev. Stat. Ann. § 169–B:14 (1990) (release to relative, friend, foster home, group home, crisis home, or shelter-care facility); S. C. Code Ann. § 20–7–600 (Supp. 1992) (release to "parent, a responsible adult, a responsible agent of a court-approved foster home, group home, facility, or program"); S. D. Codified Laws § 26–7A–89 (1992) (release to probation officer or any other suitable person appointed by the court); Tex. Fam. Code Ann. § 52.02 (Supp. 1993) (release to "parent, guardian, custodian of the child, or other responsible adult"); Utah Code Ann. § 78–3a–29(3)(a) (1992) (release to "parent or other responsible adult").

[8] As enacted in 1938, the Federal Juvenile Delinquency Act authorized a committing magistrate to release a juvenile "upon his own recognizance or that of some responsible person. . . . Such juvenile shall not be committed to a jail or other similar institution, unless in the opinion of the marshal it appears that such commitment is necessary to secure the custody of the juvenile or to insure his safety or that of others." § 5, 52 Stat. 765. The "responsible person" alternative has been a part of our law ever since.

discretion of a District Director or Chief Patrol Agent.'" *Flores* v. *Messe*, 942 F. 2d 1352, 1355 (CA9 1991). The regional Commissioner explained that the policy was "'necessary to assure that the minor's welfare and safety is *[sic]* maintained and that the agency is protected against possible legal liability.'" *Flores* v. *Meese*, 934 F. 2d 991, 994 (CA9 1990), vacated, 942 F. 2d 1352 (CA9 1991) (en banc). As the Court of Appeals noted, the Commissioner "did not cite any instances of harm which had befallen children released to unrelated adults, nor did he make any reference to suits that had been filed against the INS arising out of allegedly improper releases." 942 F. 2d, at 1355.[9]

The complete absence of evidence of any need for the policy change is not the only reason for questioning the bona fides of the Commissioner's expressed interest in the welfare of alien minors as an explanation for his new policy. It is equally significant that at the time the new policy was adopted the conditions of confinement were admittedly "deplorable."[10] How a responsible administrator could possibly

---

[9] The court added: "It has remained undisputed throughout this proceeding that the blanket detention policy is not necessary to ensure the attendance of children at deportation hearings." 942 F. 2d, at 1355. Although the Commissioner's expressed concern about possible legal liability may well have been genuine, in view of the fact that the policy change occurred prior to our decision in *DeShaney* v. *Winnebago County Dept. of Social Services*, 489 U. S. 189 (1989), the Court of Appeals was surely correct in observing that "governmental agencies face far greater exposure to liability by maintaining a special custodial relationship than by releasing children from the constraints of governmental custody." 942 F. 2d, at 1363. Even if that were not true, the Agency's selfish interest in avoiding potential liability would be manifestly insufficient to justify its wholesale deprivation of a core liberty interest. In this Court, petitioners have prudently avoided any reliance on what may have been the true explanation for the genesis of this litigation.

[10] In response to respondents' argument in their brief in opposition to the petition for certiorari that the unsatisfactory character of the INS detention facilities justified the injunction entered by the District Court, the INS asserted that "these deplorable conditions were addressed and

conclude that the practice of commingling harmless children with adults of the opposite sex[11] in detention centers protected by barbed-wire fences,[12] without providing them with education, recreation, or visitation,[13] while subjecting them to arbitrary strip searches,[14] would be in their best interests is most difficult to comprehend.

The evidence relating to the period after 1984 only increases the doubt concerning the true motive for the policy adopted in the Western Region. First, as had been true before 1984, the absence of any indication of a need for such a policy in any other part of the country persisted. Moreover, there is evidence in the record that in the Western Region when undocumented parents came to claim their children, they were immediately arrested and deportation proceedings were instituted against them. 934 F. 2d, at 1023 (Fletcher, J., dissenting). Even if the detention of children might

---

remedied during earlier proceedings in this case . . . ." Reply to Brief in Opposition 3. If the deplorable conditions prevailed when the litigation began, we must assume that the Western Regional Commissioner was familiar with them when he adopted his allegedly benevolent policy.

[11] See Deposition of Kim Carter Hedrick, *supra* n. 6, at 13.

[12] See Declaration of Paul DeMuro, Consultant, U. S. Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention (CD Cal., Apr. 11, 1987), p. 7. After inspecting a number of detention facilities, Mr. De-Muro declared:

"[I]t is clear as one approaches each facility that each facility is a locked, secure, detention facility. The Inglewood facility actually has two concentric perimeter fences in the part of the facility where children enter.

"The El Centro facility is a converted migrant farm workers' barracks which has been secured through the use of fences and barbed wire. The San Diego facility is the most jail-like. At this facility each barracks is secured through the use of fences, barbed wire, automatic locks, observation areas, etc. In addition the entire residential complex is secured through the use of a high security fence (16–18′), barbed wire, and supervised by uniformed guards." *Ibid.*

[13] See *id.*, at 8.

[14] See Defendants' Response to Requests for Admissions (CD Cal., Nov. 22, 1985), pp. 3–4.

serve a rational enforcement purpose that played a part in the original decisional process, that possibility can only add to the Government's burden of trying to establish its legitimacy.

After this litigation was commenced, the District Court enjoined the enforcement of the new policy because there was no rational basis for the disparate treatment of juveniles in deportation and exclusion proceedings. That injunction prompted the INS to promulgate the nationwide rule that is now at issue.[15] Significantly, however, in neither the rulemaking proceedings nor this litigation did the INS offer any evidence that compliance with that injunction caused any harm to juveniles or imposed any administrative burdens on the Agency.

The Agency's explanation for its new rule relied on four factual assertions. First, the rule "provides a single policy for juveniles in both deportation and exclusion proceedings." 53 Fed. Reg. 17449 (1988). It thus removed the basis for the outstanding injunction. Second, the INS had "witnessed a dramatic increase in the number of juvenile aliens it encounters," most of whom were "not accompanied by a parent, legal guardian, or other adult relative." *Ibid.* There is no mention, however, of either the actual or the approximate number of juveniles encountered, or the much smaller number that do not elect voluntary departure.[16] Third, the

---

[15] The rule differs from the regional policy in three respects: (1) it applies to the entire country, rather than just the Western Region; (2) it applies to exclusion as well as deportation proceedings; and (3) it authorizes release to adult brothers, sisters, aunts, uncles, and grandparents as well as parents and legal guardians.

[16] In its brief in this Court petitioners' attempt to describe the magnitude of the problem addressed by the rule is based on material that is not in the record—an independent study of a sample of juveniles detained in Texas in 1989, see Brief for Petitioners 8, n. 12, and the Court in turn relies on the assertions made in the brief for petitioners about the problem in 1990. See *ante,* at 295. Since all of those figures relate to a period well after the rule was proposed in 1987 and promulgated in 1988, they obvi-

Agency stated that "concern for the welfare of the juvenile will not permit release to *just any adult.*" *Ibid.* (emphasis added).[17] There is no mention, however, of the obvious distinction between "just any adult" and the broad spectrum of responsible parties that can assume care of these children, such as extended family members, godparents, friends, and private charitable organizations. Fourth, "the Service has neither the expertise nor the resources to conduct home studies for placement of each juvenile released." *Ibid.* Again, however, there is no explanation of why any more elaborate or expensive "home study" would be necessary to evaluate the qualifications of apparently responsible persons than had been conducted in the past. There is a strange irony in both the fact that the INS suddenly decided that temporary releases that had been made routinely to responsible persons in the past now must be preceded by a "home study," and the fact that the scarcity of its "resources" provides the explanation for spending far more money on detention than would be necessary to perform its newly discovered home study obligation.[18]

---

ously tell us nothing about the "dramatic increase" mentioned by the INS. 53 Fed. Reg. 17449 (1988). Indeed, the study cited by the Government also has nothing to say about any *increase* in the number of encounters with juvenile aliens. In all events, the fact that both the Government and this Court deem it appropriate to rely on a *post hoc,* nonrecord exposition of the dimensions of the problem that supposedly led to a dramatic change in INS policy merely highlights the casual character of the Agency's deliberative process. One can only speculate about whether the "dramatic increase in the number of juvenile aliens it encounters," *ibid.,* or the District Court's injunction was the more important cause of the new rule.

[17] This statement may be the source of the Court's similar comment that "the INS cannot simply send them off into the night on bond or recognizance." *Ante,* at 295. There is, of course, no evidence that the INS had ever followed such an irresponsible practice, or that there was any danger that it would do so in the future.

[18] The record indicates that the cost of detention may amount to as much as $100 per day per juvenile. Deposition of Robert J. Schmidt, Immigration and Naturalization Service (July 31, 1986), p. 76. Even the sort of

What the Agency failed to explain may be even more significant than what it did say. It made no comment at all on the uniform body of professional opinion that recognizes the harmful consequences of the detention of juveniles.[19] It made no comment on the period of detention that would be required for the completion of deportation proceedings, or the reasons why the rule places no limit on the duration of the detention. Moreover, there is no explanation for the absence of any specified procedure for either the consideration or the review of a request for release to an apparently responsible person.[20] It is difficult to understand why an

elaborate home study that might be appropriate as a predicate to the adoption of a newborn baby should not cost as much as a few days of detention. Moreover, it is perfectly obvious that the qualifications of most responsible persons can readily be determined by a hearing officer, and that in any doubtful case release should be denied. The respondents have never argued that there is a duty to release juveniles to "just any adult." 53 Fed. Reg. 17449 (1988).

[19] Consistent with the standards developed by the American Bar Association and other organizations and agencies, see n. 7, *supra,* the United States Department of Justice's own Standards for the Administration of Juvenile Justice describe "the harsh impact that even brief detention may have on a juvenile, especially when he/she is placed in a secure facility, and the corresponding need to assure as quickly as possible that such detention is necessary." U. S. Dept. of Justice, Standards for the Administration of Juvenile Justice, *supra* n. 7, at 304.

[20] As Judge Rymer pointed out in her separate opinion in the Court of Appeals: "Unlike the statutes at issue in *Schall* v. *Martin,* 467 U. S. 253 . . . (1984), and [*United States* v.] *Salerno,* [481 U. S. 739 (1987),] which survived due process challenges, the INS regulations provide no opportunity for the reasoned consideration of an alien juvenile's release to the custody of a non-relative by a neutral hearing officer. Nor is there any provision for a prompt hearing on a § 242.24(b)(4) release. No findings or reasons are required. Nothing in the regulations provides the unaccompanied detainee any help, whether from counsel, a parent or guardian, or anyone else. Similarly, the regulation makes no provision for appointing a guardian if no family member or legal guardian comes forward. There is no analogue to a pretrial services report, however cursory. While the INS argues that it lacks resources to conduct home studies, there is no substantial indication that some investigation or opportunity for independ-

agency purportedly motivated by the best interests of detained juveniles would have so little to say about obvious objections to its rule.

The promulgation of the nationwide rule did not, of course, put an end to the pending litigation. The District Court again enjoined its enforcement, this time on the ground that it deprived the members of the respondent class of their liberty without the due process of law required by the Fifth Amendment. For the period of over four years subsequent to the entry of that injunction, the INS presumably has continued to release juveniles to responsible persons in the Western Region without either performing any home studies or causing any harm to alien juveniles. If any evidence confirming the supposed need for the rule had developed in recent years, it is certain that petitioners would have called it to our attention, since the INS did not hesitate to provide us with off-the-record factual material on a less significant point. See n. 16, *supra*.

The fact that the rule appears to be an ill-considered response to an adverse court ruling, rather than the product of the kind of careful deliberation that should precede a policy change that has an undeniably important impact on individual liberty, is not, I suppose, a sufficient reason for concluding that it is invalid.[21] It does, however, shed light

---

ent, albeit informal consideration of the juvenile's circumstances in relation to the adult's agreement to care for her is impractical or financially or administratively infeasible. Although not entirely clear where the burden of proof resides, it has not clearly been imposed on the government. And there is no limit on when the deportation hearing must be held, or put another way, how long the minor may be detained. In short, there is no ordered structure for resolving custodial status when no relative steps up to the plate but an unrelated adult is able and willing to do so." *Flores* v. *Meese*, 942 F. 2d, 1352, 1374–1375 (CA9 1991) (opinion concurring in judgment in part and dissenting in part) (footnotes omitted).

[21] That fact may, however, support a claim that the INS' issuance of the regulation was arbitrary and capricious within the meaning of the Administrative Procedure Act (APA), 5 U. S. C. § 706. See *Motor Vehicle*

on the question whether the INS has legitimately exercised the discretion that the relevant statute has granted to the Attorney General. In order to avoid the constitutional question, I believe we should first address that statutory issue. In the alternative, as I shall explain, I would hold that a rule providing for the wholesale detention of juveniles for an indeterminate period without individual hearings is unconstitutional.

## II

Section 242(a) of the Immigration and Nationality Act provides that any "alien taken into custody may, in the discretion of the Attorney General and pending [a] final determination of deportability, (A) be continued in custody; or (B) be released under bond . . . containing such conditions as the Attorney General may prescribe; or (C) be released on conditional parole." 8 U. S. C. § 1252(a)(1). Despite the exceedingly broad language of § 242(a), the Court has recognized that "once the tyranny of literalness is rejected, all relevant considerations for giving a rational content to the words become operative." *United States* v. *Witkovich,* 353

---

*Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.,* 463 U. S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"). Respondents brought such a claim in the District Court, but do not renew that line of argument in this Court. In any event, even if the INS has managed to stay within the bounds of the APA, there is nonetheless a disturbing parallel between the Court's ready conclusion that no individualized hearing need precede the deprivation of liberty of an undocumented alien so long as the conditions of institutional custody are "good enough," *ante,* at 305, and similar *post hoc* justifications for discrimination that is more probably explained as nothing more than "the accidental byproduct of a traditional way of thinking about" the disfavored class, see *Califano* v. *Goldfarb,* 430 U. S. 199, 223 (1977) (STEVENS, J., concurring in judgment).

U. S. 194, 199 (1957). See also *INS* v. *National Center for Immigrants' Rights, Inc.*, 502 U. S. 183 (1991) *(NCIR)*.

Our cases interpreting § 242(a) suggest that two such "considerations" are paramount: indications of congressional policy, and the principle that "a restrictive meaning must be given if a broader meaning would generate constitutional doubts." *Witkovich*, 353 U. S., at 199. Thus, in *Carlson* v. *Landon*, 342 U. S. 524 (1952), we upheld the Attorney General's detention of deportable members of the Communist Party, relying heavily on the fact that Congress had enacted legislation, the Internal Security Act of 1950, based on its judgment that Communist subversion threatened the Nation. *Id.*, at 538. The Attorney General's discretionary decision to detain certain alien Communists was thus "wholly consistent with Congress' intent," *NCIR*, 502 U. S., at 194 (summarizing Court's analysis in *Carlson*). Just last Term, we faced the question whether the Attorney General acted within his authority in requiring that release bonds issued pursuant to § 242(a) contain a condition forbidding unauthorized employment pending determination of deportability. See *NCIR*, *supra*. Relying on related statutes and the "often recognized" principle that "a primary purpose in restricting immigration is to preserve jobs for American workers," *id.*, at 194, and n. 8 (internal quotation marks omitted), we held that the regulation was "wholly consistent with this established concern of immigration law and thus squarely within the scope of the Attorney General's statutory authority." *Ibid.* Finally, in *Witkovich*, the Court construed a provision of the Immigration and Nationality Act which made it a criminal offense for an alien subject to deportation to willfully fail to provide to the Attorney General " 'information . . . as to his nationality, circumstances, habits, associations, and activities, and such other information . . . as the Attorney General may deem fit and proper.' " 353 U. S., at 195. Noting that "issues touching liberties that the Constitution safeguards, even for an alien 'person,' would fairly be

raised on the Government's [broad] view of the statute," we held that the statute merely authorized inquiries calculated to determine the continued availability for departure of aliens whose deportation was overdue. *Id.*, at 201–202.

The majority holds that it was within the Attorney General's authority to determine that parents, guardians, and certain relatives are "presumptively appropriate custodians" for the juveniles that come into the INS' custody, *ante*, at 310, and therefore to detain indefinitely those juveniles who are without one of the "approved" custodians.[22] In my view, however, the guiding principles articulated in *Carlson*, *NCIR*, and *Witkovich* compel the opposite conclusion.

Congress has spoken quite clearly on the question of the plight of juveniles that come into federal custody. As explained above, §504 of the Juvenile Justice and Delinquency Prevention Act of 1974 demonstrates Congress' clear preference for release, as opposed to detention. See S. Rep. No.

---

[22] While the regulation provides that release can be granted to a broader class of custodians in "unusual and compelling circumstances," the practice in the Western Region after the 1984 order, but before the issuance of the injunction, was to exercise that discretion only in the event of medical emergency. See Federal Defendants' Responses to Plaintiffs' Second Set of Interrogatories (CD Cal., Jan. 30, 1986), pp. 11–12. At oral argument, counsel for petitioners suggested that "extraordinary and compelling circumstances" might include the situation where a godfather has lived and cared for the child, has a kind of family relationship with the child, *and* is in the process of navigating the state bureaucracy in order to be appointed a guardian under state law. Tr. of Oral Arg. 54. Regardless of the precise contours of the exception to the INS' sweeping ban on discretion, it seems fair to conclude that it is meant to be extremely narrow.

There is nothing at all "puzzling," *ante*, at 312, n. 7, in respondents' objection to the INS' requirement that would-be custodians apply for and become guardians in order to assume temporary care of the juveniles in INS custody. Formal state guardianship proceedings, regardless of how appropriate they may be for determinations relating to *permanent* custody, would unnecessarily prolong the detention of these children. What *is* puzzling is that the Court acknowledges, see *ibid.*, but then ignores the fact that were these children in *state* custody, they would be released to "other responsible adults" as a matter of course. See n. 7, *supra*.

93–1011, p. 56 (1974) ("[Section 504] establishes a presumption for release of the juvenile").[23]   And, most significantly for this case, it demonstrates that Congress has rejected the very presumption that the INS has made in this case; for under the Act juveniles are not to be detained when there is a "responsible party," 18 U. S. C. § 5034, willing and able to assume care for the child.[24]   It is no retort that § 504 is directed at citizens, whereas the INS' regulation is directed at aliens, *ante,* at 305–306, 312–313, n. 8; Reply Brief for Peti-

---

[23] As I have already noted, the 1938 Federal Juvenile Delinquency Act authorized the magistrate to release an arrested juvenile "upon his own recognizance or that of *some responsible person,*" § 5, 52 Stat. 765 (emphasis added).   This language was retained in the 1948 Act, see 62 Stat. 858, and amended to its present form in 1974.   The Senate Report on the 1974 bill stated that it "also amends the Federal Juvenile Delinquency Act, virtually unchanged for the past thirty-five years, to provide basic procedural rights for juveniles who come under Federal jurisdiction and to bring Federal procedures up to the standards set by various model acts, many state codes and court decisions."   S. Rep. No. 93–1011, p. 19 (1974).   Juveniles arrested by the INS are, of course, within the category of "juveniles who come under Federal jurisdiction."

[24] I find this evidence of congressional intent and congressional policy far more significant than the fact that Congress has made the unexceptional determination that state human service agencies should play a role in the permanent resettlement of refugee children, *ante,* at 313, n. 8 (citing 8 U. S. C. § 1522(d)(2)(B)), and orphans adopted abroad by United States citizens, *ante,* at 313, n. 8 (citing 8 U. S. C. § 1154(d)).   This case is not about the *permanent* settlement of alien children, or the establishment or *permanent* legal custody over alien children.   It is about the *temporary detention* of children that come into federal custody, which is precisely the focus of § 504 of the Juvenile Justice and Delinquency Prevention Act of 1974.

Furthermore, the Court is simply wrong in asserting that the INS' policy is rooted in the "universally accepted presumptio[n] as to the custodial competence of parents and close relatives," *ante,* at 313, n. 8.   The flaw in the INS' policy is not that it prefers parents and close relatives over unrelated adults, but that it prefers government detention over release to responsible adults.   It is that presumption—that detention is better or more appropriate for these children than release to unrelated responsible adults—that is contrary to congressional policy.

tioners 5, n. 4. As explained above, the INS justifies its policy as serving the best interests of the juveniles that come into its custody. In seeking to dismiss the force of the Juvenile Justice and Delinquency Act as a source of congressional policy, the INS is reduced to the absurdity of contending that Congress has authorized the Attorney General to treat allegedly illegal aliens *better* than American citizens. In my view, Congress has spoken on the detention of juveniles, and has rejected the very presumption upon which the INS relies.

There is a deeper problem with the regulation, however, one that goes beyond the use of the *particular* presumption at issue in this case. Section 242(a) grants to the Attorney General the *discretion* to detain individuals pending deportation. As we explained in *Carlson*, a "purpose to injure [the United States] could not be imputed generally to all aliens subject to deportation, so discretion was placed by the 1950 Act in the Attorney General to detain aliens without bail . . . ." 342 U. S., at 538. In my view, Congress has not authorized the INS to rely on mere presumptions as a substitute for the exercise of that discretion.

The Court's analysis in *Carlson* makes that point clear. If ever there were a factual predicate for a "reasonable presumptio[n]," *ante*, at 313, it was in that case, because Congress had expressly found that communism posed a "clear and present danger to the security of the United States," and that mere membership in the Communist Party was a sufficient basis for deportation.[25] Yet, in affirming the Attorney

---

[25] The Internal Security Act of 1950 was based on explicit findings regarding the nature of the supposed threat posed by the worldwide Communist conspiracy. The Communist Party in the United States, Congress found, " 'is an organization numbering thousands of adherents, rigidly and ruthlessly disciplined . . . [a]waiting and seeking to advance a moment when the United States may be so far extended by foreign engagements, so far divided in counsel, or so far in industrial or financial straits, that overthrow of the Government of the United States by force and violence may seem possible of achievement . . . .' " 342 U. S., at 535, n. 21 (quoting § 2(15) of the Internal Security Act of 1950).

General's detention of four alien Communists, the Court was careful to note that the Attorney General had not merely relied on a presumption that alien Communists posed a risk to the United States, and that therefore they should be detained, but that the detention order was grounded in "evidence of membership *plus* personal activity in supporting and extending the Party's philosophy concerning violence," 342 U. S., at 541 (emphasis added). In fact, the Court expressly noted that "[t]here is no evidence or contention that all persons arrested as deportable under the . . . Internal Security Act for Communist membership are denied bail," and that bail is allowed "in the large majority of cases." *Id.*, at 541–542.

By the same reasoning, the Attorney General is not authorized, in my view, to rely on a presumption regarding the suitability of potential custodians as a substitute for determining whether there is, in fact, any reason that a *particular* juvenile should be detained. Just as a "purpose to injure could not be imputed generally to all aliens," *id.*, at 538, the unsuitability of certain unrelated adults cannot be imputed generally to all adults so as to lengthen the detention to which these children are subjected. The particular circumstances facing these juveniles are too diverse, and the right to be free from government detention too precious, to permit the INS to base the crucial determinations regarding detention upon a mere presumption regarding "appropriate custodians," *ante*, at 310. I do not believe that Congress intended to authorize such a policy.[26]

---

[26] Neither *NCIR*, 502 U. S. 183 (1991), nor *Heckler* v. *Campbell*, 461 U. S. 458, 467 (1983), upon which the majority relies for the proposition that the INS can rely on "reasonable presumptions" and "generic rules," *ante*, at 313, are to the contrary. The Court mentioned the word "presumption" in a footnote in the *NCIR* case, 502 U. S., at 196, n. 11, merely in noting that the regulation at issue—a broad rule requiring that all release bonds contain a condition forbidding unauthorized employment—seemed to presume that undocumented aliens taken into INS custody were not, in fact, author-

And finally, even if it were not clear to me that the Attorney General has exceeded her authority under § 242(a), I would still hold that § 242(a) requires an individualized deter-

---

ized to work. We said that such a *de facto* presumption was reasonable because the vast majority of aliens that come into INS custody do not have such authorization, and because the presumption was easily rebutted. *Ibid.* To the extent that case has any bearing on the INS' use of presumptions, it merely says that the INS may use some easily rebuttable presumptions in identifying the class of individuals subject to its regulations—in that case, aliens lacking authorization to work. Once that class is properly identified, however, the issue becomes whether the INS can use mere presumptions as a basis for making fundamental decisions about detention and freedom. On *that* question, *NCIR* is silent; for the regulation at issue there was not based on a presumption at all. It simply provided that an alien who violates American law by engaging in unauthorized employment also violates the terms of his release from INS custody. *Id.*, at 185.

*Heckler* v. *Campbell*, 461 U. S. 458 (1983), presents a closer analog to what the INS has done in this case, but only as a matter of logic, for the factual differences between the governmental action approved in *Heckler* and the INS' policy in this case renders the former a woefully inadequate precedent to support the latter. In *Heckler*, the Court approved the use of pre-established medical-vocational guidelines for determining Social Security disability benefits, stating:

"The Court has recognized that even where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case consideration. A contrary holding would require the agency continually to relitigate issues that may be established fairly and efficiently in a single rulemaking." *Id.*, at 467 (citations omitted).

Suffice it to say that the determination as to the suitability of a temporary guardian for a juvenile, unlike the determination as to the nature and type of jobs available for an injured worker, *is* an inquiry that requires case-by-case consideration, and *is not* one that may be established fairly and efficiently in a single rulemaking. More importantly, the determination as to whether a child should be released to the custody of a friend, godparent, or cousin, as opposed to being detained in a government institution, implicates far more fundamental concerns than whether an individual will receive a particular government benefit. In my view, the Court's reliance on *Heckler* v. *Campbell* cuts that case from its administrative law

mination as to whether detention is necessary when a juvenile does not have an INS-preferred custodian available to assume temporary custody. " 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' " *Witkovich,* 353 U. S., at 201–202 (quoting *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932)). The detention of juveniles on the basis of a general presumption as to the suitability of particular custodians without an individualized determination as to whether that presumption bears any relationship at all to the facts of a particular case implicates an interest at the very core of the Due Process Clause, the constitutionally protected interest in freedom from bodily restraint. As such, it raises even more serious constitutional concerns than the INS policy invalidated in *Witkovich.* Legislative grants of discretionary authority should be construed to avoid constitutional issues and harsh consequences that were almost certainly not contemplated or intended by Congress. Unlike my colleagues, I would hold that the Attorney General's actions in this case are not authorized by § 242(a).

### III

I agree with JUSTICE O'CONNOR that respondents "have a constitutionally protected interest in freedom from institutional confinement . . . [that] lies within the core of the Due Process Clause." *Ante,* at 315 (concurring opinion). Indeed, we said as much just last Term. See *Foucha* v. *Louisiana,* 504 U. S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of liberty protected by the Due Process Clause from arbitrary governmental action"). *Ibid.*

---

moorings. I simply do not believe that Congress authorized the INS to determine, by rulemaking, that children are better off in government detention facilities than in the care of responsible friends, cousins, godparents, or other responsible parties.

("We have always been careful not to 'minimize the importance and fundamental nature' of the individual's right to liberty") (quoting *United States* v. *Salerno*, 481 U. S. 739, 750 (1987)).

I am not as convinced as she, however, that "the Court today does not hold otherwise." *Ante*, at 315 (concurring opinion). For the children at issue in this case *are* being confined in government-operated or government-selected institutions, their liberty *has been* curtailed, and yet the Court defines the right at issue as merely the "alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Ante*, at 302. Finding such a claimed constitutional right to be "nove[l]," *ante*, at 303, and certainly not "fundamental," *ante*, at 305, 311, the Court concludes that these juveniles' alleged "right" to be released to "other responsible adults" is easily trumped by the government's interest in protecting the welfare of these children and, most significantly, by the INS' interest in avoiding the administrative inconvenience and expense of releasing them to a broader class of custodians. *Ante*, at 305, 311–312.

In my view, the only "novelty" in this case is the Court's analysis. The right at stake in this case is not the right of detained juveniles to be *released* to one particular custodian rather than another, but the right not to be *detained* in the first place. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U. S., at 755. It is the government's burden to prove that detention is necessary, not the individual's burden to prove that release is justified. And, as JUSTICE O'CONNOR explains, that burden is not easily met, for when government action infringes on this most fundamental of rights, we have scrutinized such conduct to ensure that the detention serves both "legitimate and com-

pelling" interests, *id.*, at 749, and, in addition, is implemented in a manner that is "carefully limited" and "narrowly focused." *Foucha*, 504 U. S., at 81.[27]

---

[27] A comparison of the detention regimes upheld in *Salerno* and struck down in *Foucha* is illustrative. In *Salerno*, we upheld against due process attack provisions of the Bail Reform Act of 1984 which allow a federal court to detain an arrestee before trial if the Government can demonstrate that no release conditions will "'reasonably assure . . . the safety of any other person and the community.'" *Salerno*, 481 U. S., at 741. As we explained in *Foucha:*

"The statute carefully limited the circumstances under which detention could be sought to those involving the most serious of crimes . . . , and was narrowly focused on a particularly acute problem in which the government interests are overwhelming. In addition to first demonstrating probable cause, the Government was required, in a full-blown adversary hearing, to convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person . . . . Furthermore, the duration of confinement under the Act was strictly limited. The arrestee was entitled to a prompt detention hearing and the maximum length of pretrial detention was limited by the stringent limitations of the Speedy Trial Act." 504 U. S., at 81 (citations and internal quotation marks omitted).

By contrast, the detention statute we struck down in *Foucha* was anything but narrowly focused or carefully limited. Under Louisiana law, criminal defendants acquitted by reason of insanity were automatically committed to state psychiatric institutions, regardless of whether they were then insane, and held until they could prove that they were no longer dangerous. *Id.*, at 73. We struck down the law as a violation of the substantive component of the Due Process Clause of the Fourteenth Amendment:

"Unlike the sharply focused scheme at issue in *Salerno*, the Louisiana scheme of confinement is not carefully limited. Under the state statute, Foucha is not now entitled to an adversary hearing at which the State must prove by clear and convincing evidence that he is demonstrably dangerous to the community. Indeed, the State need prove nothing to justify continued detention, for the statute places the burden on the detainee to prove that he is not dangerous . . . .

. . . . .

"It was emphasized in *Salerno* that the detention we found constitutionally permissible was strictly limited in duration. Here, in contrast,

On its face, the INS' regulation at issue in this case cannot withstand such scrutiny.[28] The United States no doubt has a substantial and legitimate interest in protecting the welfare of juveniles that come into its custody. *Schall v. Martin*, 467 U. S. 253, 266 (1984). However, a blanket rule that simply *presumes* that detention is more appropriate than release to responsible adults is not narrowly focused on serving that interest. Categorical distinctions between cousins and uncles, or between relatives and godparents or other responsible persons, are much too blunt instruments to justify wholesale deprivations of liberty. Due process demands more, far more.[29] If the Government is going to detain juveniles in order to protect their welfare, due process requires that it demonstrate, *on an individual basis*, that detention in fact serves that interest. That is the clear command of our cases. See, *e. g.*, *Foucha*, 504 U. S., at 81 (finding due process violation when individual who is detained on grounds

the State asserts that . . . [Foucha] may be held indefinitely." *Id.*, at 81–82.

As explained in the text, the INS' regulation at issue in this case falls well on the *Foucha* side of the *Salerno/Foucha* divide.

[28] Because this is a facial challenge, the Court asserts that respondents cannot prevail unless there is "'no set of circumstances . . . under which the [regulation] would be valid.'" *Ante*, at 301. This is a rather puzzling pronouncement. Would a facial challenge to a statute providing for imprisonment of all alien children without a hearing fail simply because there is a set of circumstances in which at least one such alien should be detained? Is the Court saying that this challenge fails because the categorical deprivation of liberty to the members of the respondent class may turn out to be beneficial to some? Whatever the Court's rhetoric may signify, it seems clear to me, as I explain in the text, that detention for an insufficient reason without adequate procedural safeguards is a deprivation of liberty without due process of law.

[29] In objecting to this statement, see *ante*, at 311, n. 6, the majority once again mischaracterizes the issue presented in this case. As explained above, see n. 24, *supra*, the INS can of course favor release of a juvenile to a parent or close relative over release to an unrelated adult. What the INS cannot do, in my view, is prefer *detention* over *release* to a responsible adult, a proposition that hardly "revolutionize[s]" our family law.

of "dangerousness" is denied right to adversary hearing in "which the State must prove by clear and convincing evidence that he is demonstrably dangerous to the community"); *Salerno*, 481 U. S., at 742 (finding no due process violation when detention follows hearing to determine whether detention is necessary to prevent flight or danger to community); *Schall* v. *Martin*, 467 U. S., at 263 (same; hearing to determine whether there is "serious risk" that if released juvenile will commit a crime); *Gerstein* v. *Pugh*, 420 U. S. 103, 126 (1975) (holding that Fourth Amendment requires judicial determination of probable cause as prerequisite to detention); *Greenwood* v. *United States*, 350 U. S. 366, 367 (1956) (upholding statute in which individuals charged with or convicted of federal crimes may be committed to the custody of the Attorney General after judicial determination of incompetency); *Carlson* v. *Landon*, 342 U. S., at 541 (approving Attorney General's discretionary decision to detain four alien Communists based on their membership and activity in Communist Party); *Ludecke* v. *Watkins*, 335 U. S. 160, 163, n. 5 (1948) (upholding Attorney General's detention and deportation of alien under the Alien Enemy Act; finding of "dangerousness" based on evidence adduced at administrative hearings). See also *Stanley* v. *Illinois*, 405 U. S. 645, 657–658 (1972) (State cannot rely on presumption of unsuitability of unwed fathers; State must make individualized determinations of parental fitness); *Carrington* v. *Rash*, 380 U. S. 89, 95–96 (1965) (striking down blanket exclusion depriving all servicemen stationed in State of right to vote when interest in limiting franchise to bona fide residents could have been achieved by assessing a serviceman's claim to residency on an individual basis).[30]

---

[30] There is, of course, one notable exception to this long line of cases: *Korematsu* v. *United States*, 323 U. S. 214 (1944), in which the Court upheld the exclusion from particular "military areas" of all persons of Japanese ancestry without a determination as to whether any particular individual actually posed a threat of sabotage or espionage. *Id.*, at 215–

If, in fact, the Due Process Clause establishes a powerful presumption against unnecessary official detention that is not based on an individualized evaluation of its justification, why has the INS refused to make such determinations? As emphasized above, the argument that detention is more appropriate for these children than release to responsible adults is utterly lacking in support, in either the history of this litigation, or expert opinion. Presumably because of the improbability of the INS' asserted justification for its policy, the Court does not rely on it as the basis for upholding the regulation. Instead, the Court holds that even if detention is not really *better* for these juveniles than release to responsible adults, so long as it is "good enough," *ante*, at 305, the INS need not spend the time and money that would be necessary to actually serve the "best interests" of these children. *Ante*, at 304–305. In other words, so long as its cages are gilded, the INS need not expend its administrative resources on a program that would better serve its asserted interests and that would not need to employ cages at all.

The linchpin in the Court's analysis, of course, is its narrow reading of the right at stake in this case. By characterizing it as some insubstantial and nonfundamental right to be re-

---

216. The Court today does not cite that case, but the Court's holding in *Korematsu* obviously supports the majority's analysis, for the Court approved a serious infringement of individual liberty without requiring a case-by-case determination as to whether such an infringement was in fact necessary to effect the Government's compelling interest in national security. I understand the majority's reluctance to rely on *Korematsu*. The exigencies of war that were thought to justify that categorical deprivation of liberty are not, of course, implicated in this case. More importantly, the recent congressional decision to pay reparations to the Japanese-Americans who were detained during that period, see Restitution for World War II Internment of Japanese Americans and Aleuts, 102 Stat. 903, suggests that the Court should proceed with extreme caution when asked to permit the detention of juveniles when the Government has failed to inquire whether, in any given case, detention actually serves the Government's interest in protecting the interests of the children in its custody.

leased to an unrelated adult, the Court is able to escape the clear holding of our cases that "administrative convenience" is a thoroughly inadequate basis for the deprivation of core constitutional rights. *Ante,* at 311 (citing, for comparison, *Stanley* v. *Illinois,* 405 U. S. 645 (1972)). As explained above, however, the right at issue in this case is not the right to be released to an unrelated adult; it is the right to be free from Government confinement that is the very essence of the liberty protected by the Due Process Clause. It is a right that cannot be defeated by a claim of a lack of expertise or a lack of resources. In my view, then, *Stanley* v. *Illinois* is not a case to look to for comparison, but one from which to derive controlling law. For in *Stanley,* we flatly rejected the premise underlying the Court's holding today.

In that case, we entertained a due process challenge to a statute under which children of unwed parents, upon the death of the mother, were declared wards of the State without any hearing as to the father's fitness for custody. In striking down the statute, we rejected the argument that a State's interest in conserving administrative resources was a sufficient basis for refusing to hold a hearing as to a father's fitness to care for his children:

> "Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand.
>
> "*Bell* v. *Burson*[, 402 U. S. 535 (1971),] held that the State could not, while purporting to be concerned with fault in suspending a driver's license, deprive a citizen of his license without a hearing that would assess fault. Absent fault, the State's declared interest was so attenuated that administrative convenience was insufficient to excuse a hearing where evidence of fault could be con-

sidered. That drivers involved in accidents, as a statistical matter, might be very likely to have been wholly or partially at fault did not foreclose hearing and proof on specific cases before licenses were suspended.

"We think the Due Process Clause mandates a similar result here. The State's interest in caring for Stanley's children is *de minimis* if Stanley is shown to be a fit father. It insists on presuming rather than proving Stanley's unfitness solely because it is more convenient to presume than to prove. Under the Due Process Clause that advantage is insufficient to justify refusing a father a hearing when the issue at stake is the dismemberment of his family." *Id.*, at 656–658.

Just as the State of Illinois could not rely on the administrative convenience derived from denying fathers a hearing, the INS may not rely on the fact that "other concerns . . . compete for public funds and administrative attention," *ante*, at 305, as an excuse to keep from doing what due process commands: determining, on an individual basis, whether the detention of a child in a government-operated or government-sponsored institution actually serves the INS' asserted interest in protecting the welfare of that child.[31]

Ultimately, the Court is simply wrong when it asserts that "freedom from physical restraint" is not at issue in this case. That is precisely what is at issue. The Court's assumption that the detention facilities used by the INS conform to the

---

[31] Of course, even as a factual matter the INS' reliance on its asserted inability to conduct home studies because of a lack of resources or expertise as a justification for its wholesale detention policy is unpersuasive. It is perfectly clear that the costs of detention far exceed the cost of the kinds of inquiry that are necessary or appropriate for temporary release determinations. See n. 18, *supra*. Moreover, it is nothing less than perverse that the Attorney General releases juvenile *citizens* to the custody of "other responsible adults" without the elaborate "home studies" allegedly necessary to safeguard the juvenile's interests but deems such studies necessary before releasing *noncitizens* to the custody of "other responsible adults."

standards set forth in the partial settlement in this case has nothing to do with the fact that the juveniles who are not released to relatives or responsible adults are held in detention facilities. They do not have the "freedom from physical restraint" that those who are released do have. That is what this case is all about. That is why the respondent class continues to litigate. These juveniles do not want to be committed to institutions that the INS and the Court believe are "good enough" for aliens simply because they conform to standards that are adequate for the incarceration of juvenile delinquents. They want the same kind of liberty that the Constitution guarantees similarly situated citizens. And as I read our precedents, the omission of any provision for individualized consideration of the best interests of the juvenile in a rule authorizing an indefinite period of detention of presumptively innocent and harmless children denies them precisely that liberty.

I respectfully dissent.