**Vongsa SENGKEO, Petitioner,**

v.

**Gerard HORGAN, Respondent.**

**Civil Action No. 09cv11032–NG.**

United States District Court,
D. Massachusetts.

Nov. 24, 2009.

Michael P. Boudett, Rachel M. Brown, Foley Hoag LLP, Boston, MA, for Petitioner.

Mark J. Grady, Christine J. Wichers, United States Attorney's Office, Boston, MA, for Respondent.

***MEMORANDUM AND ORDER RE: PETITION FOR HABEAS COR-PUS, RESPONDENT'S MOTION TO DISMISS, AND PETITIONER'S MOTION FOR AN ORDER TO SHOW CAUSE***

GERTNER, District Judge:

Petitioner Sengkeo Vongsa,[1] ("Vongsa") a lawful permanent resident of the United States, challenges her continued detention pending the removal proceedings against her. She has been held in custody pursuant to 8 U.S.C. § 1226(c) for almost twenty months, though the sentences for the convictions that spawned these removal proceedings lasted only 60 days. She petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. She argues that her continued detention violates an implicit "reasonableness" limitation on the government's statutory authority to detain her without a bond hearing and, in any event, violates due process.

The government, by contrast, contends that Vongsa's twenty-month detention represents merely the normal progression of immigration removal proceedings. In its view, § 1226(c) lacks any limitations on the length of detention. The government further states that in order to violate due process, Vongsa's detention must "shock the conscience," which, the government contends, it does not.

This case lies at the intersection of two Supreme Court guideposts defining the limitations on the government's power to detain removable aliens: *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), and *Demore v. Kim*, 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). After a close review of those opinions, and the cases interpreting them, the Court concludes that the government may detain a person without a bond hearing pursuant to § 1226(c) but only for a reasonable period of time. Continued detention beyond that point requires strong justification and entitles the detainee to an individualized determination as to whether he or she poses a risk of flight or a danger to the community.

The Court finds that Vongsa has in fact been detained beyond a reasonable time and therefore orders the government to conduct a bond hearing on the merits within 30 days of this memorandum. Vongsa will be entitled to an immediate hearing before this Court if: (a) the government does not hold a bond hearing within the requisite time, or (b) does not hold a hearing on the merits of Vongsa's claims within the requisite time. In the event that the Immigration Judge denies her claim for bond on the merits, Vongsa will be entitled to a hearing on the question of whether her detention is "indefinite, perhaps permanent" within the meaning of *Zadvydas*, 533 U.S. at 692, 121 S.Ct. 2491, because she might not be deportable to Laos, Thailand, or any other country.[2]

## I. BACKGROUND

Vongsa is a Laotian citizen born in a refugee camp in Thailand. She came to the United States as a refugee in 1980, when she was just a few weeks old. Three years later, she obtained her green card (entitling her to "lawful permanent resident status"). She has lived in the United States since, mostly in Massachusetts, and has never been back to Laos or Thailand.

---

1. Despite the caption, Petitioner's first name is "Sengkeo"; her last name is "Vongsa." She agrees, however, to continue to use the current caption to avoid confusion. Nevertheless, for purposes of this Order, the Court will refer to her by her proper last name, "Vongsa."

2. Vongsa has submitted evidence that the United States lacks a repatriation treaty with Laos, *See Chavez–Cornejo v. Mukasey*, No. CV–07–2089, 2009 WL 151163, at *4 (D.Ariz. Jan. 20, 2009); Aff. of Sengkeo Vongsa, Document # 14, ¶¶ 17–18; Aff. of Rachel Brown, Ex. B, Document # 13–3, and that Thailand will not accept her should she be ordered removed, *see* Supp. Aff. of Rachel Brown, document # 20–2.

She also has friends and family, including her parents and her fiancé, who live in Massachusetts; she has no family or support structure in Laos or Thailand.

Over the last ten years or so, Vongsa has had a history of drug addiction, along with minor offenses. She has been arrested and charged with forgery, larceny, attempt to commit larceny by check, possession of a controlled substance, knowingly receiving stolen property, prostitution, and use of a motor vehicle without authority. These incidents, according to Vongsa, stemmed from her struggle with addiction (primarily narcotics). Some of them resulted in convictions and by 2001, a seven-month term of imprisonment for possession of cocaine. Though she was charged with being a removable alien, an Immigration Judge gave her a second chance and granted her application for cancellation of removal. In 2007, Vongsa was again convicted of possession of cocaine. She was sentenced to probation, which included mandatory drug testing. (The record does not reveal what ramifications, if any, this 2007 conviction had on her immigration status.)

A year later, in January 2008, Vongsa missed a mandatory drug test and also forged a check on a friend's account. She turned herself in, was convicted, and served sixty days in state custody, thirty for the probation violation and thirty for forging the check.

Meanwhile, in mid-February 2008, Immigration and Customs Enforcement ("ICE") initiated removal proceedings against Vongsa.[3] At the hearing, Vongsa, through counsel, conceded that she was ineligible for withholding of removal. Nevertheless, she applied for political asylum and for relief under the Convention

Against Torture ("CAT"). On March 21, 2008, after serving her second thirty-day state sentence, Vongsa was transferred to the custody of ICE, which detained her pursuant to 8 U.S.C. § 1226(c)(1)(B). She has been detained by ICE ever since.

Shortly after entering ICE's custody, Vongsa requested a bond hearing. *See* 8 C.F.R. § 236.1(c). But the IJ dismissed her request without considering the usual bail issues, namely, whether she posed a flight risk or a danger to the community. The IJ instead concluded that he lacked jurisdiction to conduct a bond hearing at all. Vongsa did not appeal.

On September 23, 2008, the IJ decided Vongsa's political asylum claim in her favor. Vongsa had testified to her fear that, without a support system in Laos, she would become a target for human trafficking and forced prostitution. The IJ found Vongsa's testimony credible and further, found that the country reports (released by the United States Department of State) echoed what Vongsa said. Women and girls in Laos and Thailand were at substantial risk of being sold into the sex trade. In light of this reality, the IJ found deportation to be "unconscionable." Though Vongsa's prior drug use weighed against her claim, the IJ granted Vongsa asylum.

ICE immediately appealed, and throughout, Vongsa remained in custody. Some eight-and-a-half months later, on June 9, 2009, the Board of Immigration Appeals ("BIA") reversed the IJ's asylum decision and remanded for further proceedings. *In re Vongsa*, File: A025 032 611—Boston, MA (BIA June 9, 2009). The BIA concluded that the IJ erred in "circularly" defining the social group to

---

3. In between serving the two state sentences, Vongsa was transferred to ICE custody for six days to initiate removal proceedings. After those six days, she was returned to state custody to serve her second thirty-day sentence.

which Vongsa belonged. The IJ had defined Vongsa's social group as "young women deportees without a support system who will be targeted for human trafficking." The BIA held that individuals in a valid social group must share a narrowing characteristic other than the risk of persecution. For the BIA, the IJ's group definition, minus the persecution factors, was not enough. The BIA stated that the definition of "young women deportees without a support system" was too broad and not sufficiently "socially visible." *Id.* at 2. The BIA remanded for the IJ to consider Vongsa's CAT claim.[4]

A hearing on the CAT claim has yet to take place. There have been a series of delays, some due to the fact that Vongsa received new counsel who continues to push the case back. The IJ scheduled a "master hearing"[5] for July 30, 2009, but Vongsa requested and was granted a continuance until August 27, when the IJ finally held the master hearing. The IJ then scheduled the "individual hearing" on Vongsa's CAT claim for October 6, but again Vongsa requested and was granted a continuance until October 29. Instead of rescheduling the individual hearing, though, the IJ held another master hearing on October 29, and then scheduled a calendar status hearing for January 7, 2010.

Through it all, Vongsa languishes at the Suffolk County House of Correction, the detention time now totaling nearly twenty months.

## II. DISCUSSION

On June 15, 2009, Vongsa filed a pro se habeas petition pursuant to 28 U.S.C. § 2241, challenging her continued detention without a bond hearing. The government moved to dismiss the petition (document # 4). Vongsa, now represented by counsel, opposed that motion and later filed a motion to show cause why she should continue to be detained (document # 11).

Vongsa seeks release because of the unreasonable length of her detention. She has been in ICE custody pending her removal proceedings ten times longer than her original criminal sentences. She contends that, in light of *Zadvydas,* 533 U.S. 678, 121 S.Ct. 2491, and *Demore,* 538 U.S. 510, 123 S.Ct. 1708, her continued detention is no longer "reasonable."

The government counters with two responses. First, the government argues

---

4. The State Department specifically highlights the problem of sex trafficking in women and girls in Laos, *see* U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, 2008 Human Rights Report: Laos, http://www.state.gov/g/drl/rls/hrrpt/2008/eap/119045.htm (last visited November 23, 2009), and in the country report of Thailand, the State Department highlights problems with the treatment of Laotian refugees, as well as sex trafficking, *see* U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, 2008 Human Rights Report: Thailand, http://www.state.gov/g/drl/rls/hrrpt/2008/eap/119058.htm (last visited November 23, 2009). Thus, Vongsa is not just any "young woman deportee without a social support system." Should she be sent to Thailand, her prior record and her anomalous status as a Laotian refugee in a Thai refugee camp may well make it even more likely that she will wind up in the sex trade.

5. A "master hearing" effectively serves the combined functions of an initial appearance in a criminal case and a status/scheduling conference in a civil case. The purposes of a master hearing are, among other things, to advise the respondent of his or her rights, explain the charges he or she faces, identify and narrow the factual and legal issues, set deadlines for briefing, and schedule hearings. *See* The Office of the Chief Immigration Judge, Immigration Court Practice Manual § 4.15(e), http://www.justice.gov/eoir/vll/OCIJPracManual/Chap%204.pdf (last visited November 23, 2009).

that the Court should dismiss Vongsa's petition because she has failed to exhaust her administrative remedies. Second, even if Vongsa clears the exhaustion hurdle, the government contends that her continued detention is lawful. The government rejects the notion of a "reasonableness" limitation on the government's power to detain, and submits that Vongsa's detention would be constitutionally problematic only if it "shocked the conscience," which, the government says, it does not. The Court addresses each of these arguments in turn.

## A. Exhaustion of Administrative Remedies

The law is clear that the Court has jurisdiction to consider Vongsa's habeas petition challenging the length of her preremoval detention. *See Demore v. Kim*, 538 U.S. 510, 516–17, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (concluding that 8 U.S.C. § 1226(e) "does not bar respondent's constitutional challenge to the legislation authorizing his detention without bail"); *Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir.2007) ("[W]e have held that district courts retain jurisdiction over challenges to the legality of detention in the immigration context.") (citing *Hernandez v. Gonzales*, 424 F.3d 42, 42 (1st Cir.2005)); *Campbell v. Chadbourne*, 505 F.Supp.2d 191, 195–96 (D.Mass.2007) (concluding that 8 U.S.C. § 1226(e) does not strip district courts of jurisdiction over challenges to an alien's detention under § 1226(c)) (citing *Gonzalez v. O'Connell*, 355 F.3d 1010, 1014 (7th Cir.2004)).

■■■ Nonetheless, the government argues that the Court should dismiss Vongsa's habeas petition because she failed to exhaust her administrative remedies. Exhaustion is not statutorily required when challenging one's detention. *Campbell*, 505 F.Supp.2d at 197 (citing *O'Connell*, 355

F.3d at 1016). But even without a statutory mandate, courts often still require exhaustion as a matter of "sound judicial discretion." *Id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992)); *see also Accion Social de Puerto Rico, Inc. v. Viera Perez*, 831 F.2d 365, 369 (1st Cir.1987) ("Unless statutorily mandated, however, application of the exhaustion doctrine is not a jurisdictional requirement, but within the discretion of the district court."). In fact, the general rule is that parties must exhaust administrative remedies before pursuing federal judicial relief. *O'Connell*, 355 F.3d at 1016 (citing *McCarthy*, 503 U.S. at 144–45, 112 S.Ct. 1081). According to the Supreme Court, exhaustion "serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy*, 503 U.S. at 145, 112 S.Ct. 1081.

What Vongsa seeks in this Court is a bond hearing, and as to that proceeding, Vongsa has indeed failed to exhaust her administrative remedies. Though the IJ dismissed her original request for a bond hearing on jurisdictional grounds, she could technically seek a "redetermination" of that decision pursuant to 8 C.F.R. § 1003.19. Even if she could not seek a redetermination—for example, if she could not show that her circumstances have materially changed, *see* 8 C.F.R. § 1003.19(e)—her failure to appeal the IJ's ruling on the bond issue amounts to a procedural default. That the time has lapsed on her ability to appeal that ruling, *see* 8 C.F.R. § 1003.38(b) (30–day appeal period), is hardly grounds to conclude that she has exhausted her remedies. *See Cohen v. Mukasey*, 2009 WL 1766843, at *5 (D.Colo. June 22, 2009).

■■■ But there are exceptions to this prudential exhaustion requirement, *see O'Connell*, 355 F.3d at 1016, which Vongsa,

the party seeking to avoid the requirement, bears the burden of establishing, *Rose v. Yeaw*, 214 F.3d 206, 210–11 (1st Cir.2000). Chief among those exceptions, for purposes of this case, is futility. In other words, "where the administrative body ... has otherwise predetermined the issue before it," *McCarthy*, 503 U.S. at 148, 112 S.Ct. 1081, and the claimant has "no reasonable prospect of obtaining relief," *O'Connell*, 355 F.3d at 1019 (internal quotation omitted). *See also Rose*, 214 F.3d at 210–11.

It is clear that Vongsa has virtually no chance of obtaining a bond hearing by once again requesting one via the administrative process. The IJ already ruled that he lacks jurisdiction to hold a bond hearing. More importantly, the BIA has clearly and repeatedly upheld the denial of a bond hearing under the view that § 1226(c) mandates detention without bond. *See Bourguignon v. MacDonald*, 667 F.Supp.2d 175, 179 (D.Mass.2009) ("The BIA held that it lacked the authority to adjudicate constitutional challenges to 8 U.S.C. § 1226(c) and affirmed the IJ's mandatory detention decision without further discussion."); *Cox v. Monica*, No. 1:07–CV–0534, 2007 WL 1804335, at *2–*3 (M.D. Pa. June 20, 2007) (finding futility and citing *In re Garcia–Ramirez*, 2004 WL 2952340 (B.I.A.2004), along with two other cases, *In re Younes* and *In re Edwards*, which lacked citation); *Galvez v. Lewis*, 56 F.Supp.2d 637, 643–44 (E.D.Va. 1999) (finding futility and citing *In re Noble*, 1997 WL 61453 (B.I.A.1997), and *In re Valdez*, 1997 WL 80989 (B.I.A.1997)). Clearly, any attempt to seek a "redetermination" of the IJ's original dismissal of Vongsa's request for a bond hearing would be in vain.

The government points out, however, that the First Circuit has observed that "merely because the agency has previously rejected an argument is no basis for failing to make the claim in one's own case." *Sousa v. INS*, 226 F.3d 28, 32 (1st Cir. 2000) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952)). But this line from *Sousa* fails to capture the context of that case, which distinguishes it from Vongsa's. In *Sousa*, the statute at issue mandated exhaustion, meaning that the exhaustion requirement was "more rigid than the common law doctrine" and thus had to be applied in a "more draconian fashion." *Id.* at 31. Furthermore, the court noted that the BIA decisions upon which the alien based his claim for futility were decided *after* the alien's appeal had been decided, so regardless of whether statutorily required or not, futility could not apply. *Id.* at 32.

Moreover, if read as broadly as the government suggests, the First Circuit's proposition in *Sousa* would eviscerate the futility exception, a position this Court cannot accept. Despite an agency's clear and consistent stance against a claimant on an issue, the claimant would still have to try his hand with the agency first, even where, as here, the passage of time in prison is precisely the harm the hearing is to avoid. But the Supreme Court has expressly recognized the viability of the futility exception in certain circumstances, particularly when the agency has "predetermined the issue before it," *see McCarthy*, 503 U.S. at 148, 112 S.Ct. 1081, which is precisely the case here. The BIA has repeatedly held that bond hearings are not available to aliens detained under § 1226(c). *See Cox*, 2007 WL 1804335, at *2–*3; *Galvez v. Lewis*, 56 F.Supp.2d at 643–44; *cf. Campbell*, 505 F.Supp.2d at 198 (declining to find an exception to exhaustion, in part, because "[the detainee] has not pointed to any case in which the BIA has finally determined whether a refugee who has been in the United States for over one

year and refuses to adjust his status to lawful permanent resident may be subjected to removal proceedings"). With the issue pre-decided against her, Vongsa's attempt to seek a bond hearing would hardly "promot[e] judicial efficiency." It would just contribute to the troubling delay she has already experienced in attempting to resolve her immigration status. *Cf. McCarthy*, 503 U.S. at 146–47, 112 S.Ct. 1081 (exhaustion excused where "requiring resort to the administrative remedy may occasion undue prejudice ... [such as] ... an unreasonable or indefinite timeframe for administrative action"). Accordingly, the Court concludes that futility excuses Vongsa's failure to exhaust her administrative remedies.

## B. The Lawfulness of Vongsa's Continued Detention

Turning to merits of Vongsa's habeas petition, the Court must first address what limits due process and § 1226(c) itself place on the government's authority to detain Vongsa without a hearing. Then the Court discusses whether Vongsa's continued detention exceeds those limits.

### 1. Limitations on Pre-Removal Detention

■ Whether Vongsa's continued detention is lawful lies at the intersection of two Supreme Court decisions: *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), and *Demore v. Kim*, 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). *Zadvydas* held that detention after an alien is found to be removable (which the Court calls "post-removal detention"), *see* 8 U.S.C. § 1231(a)(6), must last for only a "reasonable time," because indefinite detention of an alien would be constitutionally dubious. In contrast, *Demore* held that detention *before* an alien is found to be removable (which the Court calls "*pre*-removal detention"), which is at

issue in this case, *see* 8 U.S.C. § 1226(c), is lawful. Significantly, *Demore*, unlike *Zadvydas*, did not concern the *length* of pre-removal detention, only whether detention without a bond hearing is constitutional per se.

This case then centers on that bit of unfinished business in *Demore*—whether indefinite pre-removal detention is lawful, or whether due process or § 1226(c) itself imposes some time limitation. Put differently, the issue in this case is whether the holding of *Zadvydas* extends to *pre*-removal detention. *See Ly v. Hansen*, 351 F.3d 263, 267 (6th Cir.2003). The Court concludes that it does.

■ The Due Process Clause forbids the government from depriving a person of his or her "liberty ... without due process of law." Const. Amend. V. Freedom from bodily restraint lies at the core of the liberty that the Clause protects. *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). The Supreme Court has consistently held that the Constitution constrains the government's power to civilly detain a person absent the protections of criminal proceedings. *See, e.g., Kansas v. Hendricks*, 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ("A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment.") *Foucha*, 504 U.S. at 86, 112 S.Ct. 1780 ("[T]he State must establish insanity and dangerousness by clear and convincing evidence in order to confine an insane convict beyond his criminal sentence, when the basis for his original confinement no longer exists."); *United States v. Salerno*, 481 U.S. 739, 750–52, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (outlining myriad protections for pre-trial detention); *Addington v. Texas*, 441 U.S. 418, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) ("[T]he individual's interest in the outcome of a

civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence."); *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) ("We hold, consequently, that a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."). And it goes without question that these due process protections safeguard the rights of citizens and aliens alike. *Reno v. Flores*, 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).

The Court in *Zadvydas* applied these bedrock due process principles to civil detention in the immigration context. In *Zadvydas*, 533 U.S. 678, 121 S.Ct. 2491, the detainees had been ordered removed and were awaiting deportation. But deportation was highly unlikely: one detainee could not establish citizenship with his home country, and the United States lacked a repatriation treaty with the other's home country. In response to the detainees' challenges to their continued detention, the government claimed that it could hold the detainees indefinitely. The Court rejected that argument, observing that indefinite detention "would raise a serious constitutional problem," *id.* at 690, 121 S.Ct. 2491. The Court concluded that the period of post-removal detention must be reasonable, *id.* at 700, 121 S.Ct. 2491.[6] "Reasonableness" means that the government has six months after the order of removal issues to deport an alien. *Id.* at

701, 121 S.Ct. 2491. After that, if the alien can establish that there is "no significant likelihood of removal in the reasonably foreseeable future," then "the government must respond with evidence sufficient to rebut that showing." *Id.* If it cannot, the alien must be released. Accordingly, *Zadvydas* established that due process limits civil detention during immigration proceedings.

*Demore*, on the other hand, held that due process does not bar the government from detaining aliens without a bond hearing while their removal proceedings are pending. In *Demore*, unlike *Zadvydas*, the alien had not yet been ordered removed. Instead, the alien had been detained pursuant to 8 U.S.C. § 1226(c), which mandates detention pending removal proceedings. The alien challenged his detention, arguing that due process required INS (the predecessor to ICE) to determine whether he posed a danger to society or a risk of flight. In other words, he requested a bond hearing at the outset of his detention. The Court rejected the alien's claim, "recogniz[ing] detention during deportation proceedings as a constitutionally valid aspect of the deportation process." *Demore*, 538 U.S. at 523, 123 S.Ct. 1708. Furthermore, the Court found its reasoning in *Zadvydas* distinguishable in two respects: First, while detention in *Zadvydas* no longer served any purpose since the detainees could not be repatriated, the detainee in *Demore* was deportable. *Id.* at 527–28, 123 S.Ct. 1708. Second, detention in *Demore* was "of a much shorter duration." *Id.* at 528, 123 S.Ct. 1708. As a result, the Court upheld the alien's pre-removal detention.

The government suggests that *Demore* limited *Zadvydas's* holding to post-removal detention, because pre-removal detention

---

**6.** In the name of constitutional avoidance, the Court read the "reasonable time" limitation

into the post-removal detention statute. *Id.* at 699, 121 S.Ct. 2491.

is always of definite duration: "At some point, the removal proceeding will come to an end and a removal order either will issue or will not be issued." (Resp't Opp. to Pet's Mot. to Show Cause, Document # 16 at 13.) As long as removal proceedings are progressing, the alien has no right to release, even absent findings of dangerousness or risk of flight. The only backstop to indefinite pre-removal detention, according to the government, is if the alien can show that the circumstances of her detention "shock the conscience," meaning that they are "intended to injure [the] alien and [are] unjustified by any government interest." (*Id.* at 14.)

The Court disagrees. Both the majority and concurring opinions in *Demore* make clear that the "reasonable time" limitation in *Zadvydas* applies to detention both post- and *pre*-removal. Though the *Demore* majority opinion upheld pre-removal detention, it did so under the qualification that due process permitted pre-removal detention "for the *brief period necessary* for . . . removal proceedings" to run their course. *Demore*, 538 U.S. at 513, 523, 123 S.Ct. 1708 (emphasis added). Duration of detention was a point upon which the Court specifically distinguished *Zadvydas*. *Id.* at 528, 123 S.Ct. 1708. The Court noted that in 85% of cases, removal proceedings were, on average, completed within 47 days, with a median of 30 days. *Id.* at 529, 123 S.Ct. 1708. In the 15% of cases that involved appeals to the BIA, the Court found that an appeal takes an average of four months, with the median time being slightly shorter. *Id.* Nothing in *Demore* suggested that pre-removal detention could be indefinite. If an alien's pre-

removal detention continues for an unreasonable length of time, *Demore* requires greater constitutional scrutiny.[7]

Indeed, that is what Justice Kennedy, who supplied the fifth vote in *Demore*, would require:

> [S]ince the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified. . . . Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons.

*Demore*, 538 U.S. at 532–33, 123 S.Ct. 1708 (Kennedy, J., concurring). Justice Kennedy's concurrence explicitly illustrates the intersection between *Zadvydas* and *Demore*: "Unreasonable delay" can be constitutionally problematic whether it occurs pre- or post-removal. *Demore* permits pre-removal detention without bond so long as detention is reasonable, that is, for the "brief period necessary" to commence and conclude removal proceedings. Those detained for an unreasonable length of time are entitled to some individualized determination as to why continued detention is required.

Several courts of appeals and numerous district courts have come to the same conclusion. In *Ly v. Hansen*, 351 F.3d 263 (6th Cir.2003), for example, the Sixth Cir-

---

7. In *Yong Tang v. Chertoff*, 493 F.Supp.2d 148 (D.Mass.2007), for example, in which the Court compelled the United States Citizenship and Immigration Service ("USCIS") to act on a four-year-old application for adjustment of status, the Court noted, "I cannot accept the argument that, simply because adjustment of status is a form of discretionary relief, there is no limit to the length of time the USCIS may take processing applications. The duty to act is no duty at all if the deadline is *eternity*." *Id.* at 150 (emphasis added).

cuit held that "INS may detain prima facie removable aliens for a time reasonably required to complete removal proceedings in a timely manner. If the process takes an unreasonably long time, the detainee may seek relief in habeas proceedings." *Id.* at 268. In Ly, the petitioner had been held for a year and a half pending removal proceedings. Although the petitioner was in part responsible for the delay, *id.* at 272, the court found that continued detention was unreasonable and affirmed the grant of the writ of habeas corpus, *id.* at 273. *See also Hussain v. Mukasey,* 510 F.3d 739, 743 (7th Cir.2007) ("Inordinate delay before the order was entered might well justify relief, [citing *Ly* ], with habeas corpus the appropriate vehicle for obtaining it, as we know from *Zadvydas* and [*Demore* ]. It would be a considerable paradox to confer a constitutional or quasi-constitutional right to release on an alien ordered removed (*Zadvydas* ) but not on one who might have a good defense to removal.").

Likewise, in *Tijani v. Willis,* 430 F.3d 1241 (9th Cir.2005), the Ninth Circuit ruled in favor of a detainee who had been held for two years and eight months pending removal proceedings. *Id.* at 1242. Noting that, under *Zadvydas,* post-removal detention of that length was constitutionally dubious, the court interpreted the government's authority under § 1226(c) to extend only to the "expedited removal of criminal aliens." *Id.* Because two years and eight months was not "expeditious," the court concluded that, absent a finding that the detainee posed a danger to the community or a flight risk, further detention exceeded the authority given under the statute. *Id.*

Though the First Circuit has yet to speak on this issue, several district courts in the circuit have also interpreted *Demore* as requiring that the length of pre-removal detention be reasonable. *See Bourguig-*

*non v. MacDonald,* 667 F.Supp.2d 175, 182–83 (D.Mass.2009); *Winkler v. Horgan,* 629 F.Supp.2d 159, 160 (D.Mass.2009); *see also Madrane v. Hogan,* 520 F.Supp.2d 654, 665–67 (M.D.Pa.2007) (granting writ of habeas corpus and citing cases from various circuit and district courts).

In light of the language in *Demore,* Justice Kennedy's concurrence, and this weight of authority, the Court cannot accept the government's position that pre-removal detention is exempt from the bedrock due process principles relied upon in *Zadvydas.* As *Demore* holds, the government may detain prima facie removable aliens without special justification for the brief period necessary to complete their removal proceedings. *Demore,* 538 U.S. at 513, 123 S.Ct. 1708. Unreasonable delay in pre-removal detention, however, requires "sufficiently strong special justification," *See Zadvydas,* 533 U.S. at 690, 121 S.Ct. 2491, such as protecting against "risk of flight or dangerousness," *Demore,* 538 U.S. at 532, 123 S.Ct. 1708 (Kennedy, J. concurring). To avoid a constitutional confrontation, however, this Court construes the pre-removal detention statute, 8 U.S.C. § 1226(c), to include an implicit requirement that removal proceedings, and the detention that accompanies them, be concluded within a reasonable time. *See Ly,* 351 F.3d at 270; *see also Zadvydas,* 533 U.S. at 689, 121 S.Ct. 2491 (construing post-removal detention statute, 8 U.S.C. § 1231(a), to contain a reasonable time limitation).

Along these lines, the Court cannot agree with the government that pre-removal detention must "shock the conscience" to trigger the need for a bond hearing. Neither *Zadvydas* nor *Demore* so much as mentions a "shock-the-conscience" standard. In those cases, and most of the circuit and district court opinions interpreting them, the standard is

"reasonableness." Moreover, a "shock-the-conscience" standard would not typically be appropriate in this context. *Cf. County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (examining whether high speed police chase resulting in death of suspect violated substantive due process); *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (examining whether forced pumping of a suspect's stomach violated substantive due process).

Vongsa challenges the extent to which 8 U.S.C. § 1226(c) gives the government authority to constrain her freedom without an individualized justification.[8] In this sense, Vongsa's claim challenges legislative action that implicates both substantive due process rights that are "implicit in the concept of ordered liberty," *See Salerno*, 481 U.S. at 746, 107 S.Ct. 2095, as well as Vongsa's procedural due process rights, *see Reno*, 507 U.S. at 306, 113 S.Ct. 1439. From either perspective, "shocks the conscience" is not the metric by which to measure Vongsa's continued detention.[9] *See Lewis*, 523 U.S. at 846, 118 S.Ct. 1708. The Court, instead, will examine Vongsa's pre-removal detention under the reasonableness standard set forth in *Zadvydas* and *Demore*.

**2. Vongsa's Unreasonable Detention**

■ Vongsa's continued detention—approaching twenty months now—constitutes unreasonable delay. This length of detention, plus the fact that an end to these proceedings cannot be seen on the horizon,

entitles her to an individualized determination of whether she poses a danger to society or a risk of flight. *See Bourguignon*, 667 F.Supp.2d at 182–83.

Twenty months can hardly be characterized as "the brief period necessary" for removal proceedings. This is over three times longer than the average period of detention in cases that involve an appeal to the BIA, *See Demore*, 538 U.S. at 529, 123 S.Ct. 1708 (average time for detention with BIA appeals is just under six months), and it is ten times as long as Vongsa's original 60–day sentence. Countless courts have granted habeas petitions or ordered bond hearings for similarly lengthy periods of pre-removal detention. *See, e.g., Ly*, 351 F.3d at 270–72 (eighteen months); *Tijani*, 430 F.3d at 1242 (two years and eight months); *Bourguignon*, 667 F.Supp.2d at 182–84 (twenty-seven months); *Alli v. Decker*, 644 F.Supp.2d 535, 537–38 (M.D.Pa.2009) (two detainees held for nine months and twenty months, respectively); *Prince v. Mukasey*, 593 F.Supp.2d 727, 735, 737 (M.D.Pa.2008) (sixteen months); *Wilks v. DHS*, 2008 WL 4820654, at *3 (M.D.Pa.2008) (two and one-half years); *Singh v. Sepulveda*, No. C 08–00881, 2008 WL 2242215, at *4 (N.D.Cal. May 29, 2008) (fourteen months); *Madrane*, 520 F.Supp.2d at 666–67 (three years); *Diomande v. Wrona*, No. 05–73290, 2005 WL 3369498, at *1 (E.D.Mich. Dec. 12, 2005) (twenty-one months). *But see Matthias v. Hogan*, No. 4:CV-07–1987, 2008 WL 913522, at *8 (M.D.Pa. Mar. 31, 2008) (de-

---

**8.** In fact, Vongsa's suit must challenge the government's statutory authority, since the Court does not have jurisdiction over discretionary decisions by the executive in the detention context. *See* 8 U.S.C. § 1226(e).

**9.** Even the case on which the government relies for its shocks-the-conscience argument, *Aguilar v. ICE*, 510 F.3d 1 (1st Cir.2007), is distinguishable. In *Aguilar*, the First Circuit employed a "shocks-the-conscience" standard

when considering whether the aliens' immediate detention and transfer to faraway detention and removal operations centers violated the aliens' rights to "make decisions as to the care, custody, and control of their children." *Id.* at 18–19, 21. This hardly resembles Vongsa's straightforward challenge to ICE's authority to indefinitely detain her without a hearing under § 1226(c).

nying habeas petition because seven month delay was not more than "brief period" of detention permitted for removal proceedings).

■ The government counters that some part of this delay is attributable to Vongsa's own actions. To be sure, detainee responsibility for delayed proceedings should be taken into account when assessing the reasonableness of a period of detention. *See Demore*, 538 U.S. at 530–31, 123 S.Ct. 1708; *Ly*, 351 F.3d at 272; *Prince*, 593 F.Supp.2d at 735–36; *Madrane*, 520 F.Supp.2d at 666. Here, though, any delay attributable to Vongsa is a drop in the proverbial bucket. Vongsa has requested two continuances that account for only fifty days of her detention—approximately one-twelfth of the almost 600 days she has spent locked up pending removal proceedings. *See Madrane*, 520 F.Supp.2d at 666 ("[T]hese delays, which appear to have extended the process for approximately six months, make up only a fraction of the amount of time Petitioner has been held in custody during his removal proceedings, and the fact that Petitioner obtained continuances and prevailed on his claims before an IJ in having his status adjusted do not serve to vitiate the Court's concern over what appears to be an extraordinarily lengthy deprivation of liberty.").

Moreover, the largest chunk of the delay stemmed from the government's own appeal of the IJ's asylum decision. For reasons unknown, that appeal alone took over eight months, more than double the four-month average cited in *Demore*. As the Sixth Circuit explained in Ly:

[A]lthough an alien may be responsible for seeking relief, he is not responsible for the amount of time that such determinations may take. The mere fact that an alien has sought relief from deportation does not authorize the INS to drag its heels indefinitely in making a decision. The entire process, not merely the original deportation hearing, is subject to the constitutional requirement of reasonability.

*See Ly*, 351 F.3d at 272. So even accounting for Vongsa's continuances, the Court remains convinced that the length of her detention is unreasonable.

Beyond the sheer length of time Vongsa has already spent in custody, there appears to be, as one court recently put it, "no end in sight." *Bourguignon*, 667 F.Supp.2d at 184. The government makes it seem that final resolution of Vongsa's case is just around the corner, but the record reflects that is simply not the case. The government contends that Vongsa has conceded deportability and is, in a sense, just awaiting an impending removal order. But that mischaracterizes Vongsa's position. True, she has conceded that she is ineligible for one form of relief—withholding of removal—but she has vigorously challenged her deportability through other channels, including seeking, and at first receiving, political asylum. *See id.* at 183 n. 10. While the asylum claim was reversed, she continued to pursue a colorable claim under the Convention Against Torture. Yet months have passed since the BIA reversed the IJ's asylum decision and remanded for consideration of Vongsa's CAT claim. The only proceeding on the horizon is another "status hearing" in January 2010. When an IJ will finally consider the merits of the CAT claim is unknown. Moreover, Vongsa's experience with the appellate process indicates that it could be many more months or even years before her case is fully resolved. As such, resolution of Vongsa's removal proceedings is not reasonably foreseeable, further contributing to the Court's conclusion that her

continued detention is unreasonable.[10] *See Ly*, 351 F.3d at 273; *Bourguignon*, 667 F.Supp.2d at 183–84; *Madrane*, 520 F.Supp.2d at 667.

### C. The Remedy

That does not mean, however, that Vongsa should be released forthwith. A bond hearing to determine whether and to what extent Vongsa poses a risk of flight or danger to the community is the prudent course in this case. *See Demore*, 538 U.S. at 532–33, 123 S.Ct. 1708 (Kennedy, J., concurring).

Vongsa has lived in the United States since she was six weeks old, and in Massachusetts since she was in elementary school. Her family and fiancé live in Massachusetts, and she has no family in Laos or Thailand; so flight is unlikely. Nevertheless, she has a criminal record, albeit of minor crimes, from fraud to forgery to prostitution, stemming from her addiction to drugs. Whether and to what extent she poses a danger to the community is an important factor in determining whether she should be released.

Since Vongsa's detention has already reached an unreasonable length, the Court will order Respondents to conduct a bond hearing before an IJ or other neutral arbiter within 30 calendar days of this memorandum. *See Bourguignon*, 667 F.Supp.2d at 183–84; *Wilks*, —— F.Supp.2d at ——. Failure to conduct a hearing within the time allotted, or failure to consider her claim for bond on the merits, will entitle Vongsa to an immediate bond hearing before this Court.[11] *See Bourguignon*, 667 F.Supp.2d at 184.

### III. CONCLUSION

The Petition for a Writ of Habeas Corpus (**document # 1**) is hereby **GRANTED,** and the Respondent's Motion to Dismiss (**document # 4**) is **DENIED.** The Petitioner's Motion to Show **Cause** (**document # 11**) is also **GRANTED.** The case will remain open pending compliance with the Court's order, as follows:

1. An Immigration Judge or other neutral arbiter shall hold a bond hearing on or before December 24, 2009, to determine whether Petitioner poses a risk of flight or danger to the community. If Petitioner is found to be dangerous or pose a flight risk, the Immigration Judge shall consider whether conditions may be placed upon Petitioner's release that will reasonably insure that she will pose neither a danger to the community nor a risk of flight. If such conditions are found to exist, Petitioner will be released from custody.

---

**10.** The government focuses heavily on Vongsa's deportability, that is, if she was found to be removable, whether she could be deported to another country, such as Thailand, the country of her birth. *See* 8 U.S.C. § 1231(b)(2)(E)(iv). The Supreme Court's holding in *Zadvydas* was based in part on the fact that the petitioner in that case could not be repatriated. *See Demore*, 538 U.S. at 527, 123 S.Ct. 1708 (citing *Zadvydas*, 533 U.S. at 690, 121 S.Ct. 2491). *Zadvydas* and *Demore* are not so narrow as to permit indefinite detention any time there is some chance that the government could effect deportation. *See Demore*, 538 U.S. at 532–33, 123 S.Ct. 1708 (Kennedy, J. concurring). Rather, the rele-

vant inquiry is whether there is a significant likelihood of removal in the reasonably foreseeable future. *See Zadvydas*, 533 U.S. at 701, 121 S.Ct. 2491; *Ly*, 351 F.3d at 273. Here, as just discussed, the conclusion of Vongsa's removal proceedings is not reasonably foreseeable.

**11.** In the event that the IJ denies her claim for bond on the merits, Vongsa could return to this Court to argue that her detention is nonetheless "indefinite, perhaps permanent," *See Zadvydas*, 533 U.S. at 692, 121 S.Ct. 2491, because she cannot be deported to Laos, Thailand, or any other country, *see supra* note 2.

2. Counsel for Respondents will report to this Court on or before December 31, 2009, regarding compliance with this Order. This report will include notification as to the outcome of the bond hearing.

3. Failure to conduct the bond hearing at all or a hearing on the merits as ordered will entitle Petitioner to an immediate bond hearing before this Court.

**SO ORDERED.**